399 F.2d 14
 Donald A. SCOTT, Administrator of the Estate of Thomas L. Moody, Deceased
v.
EASTERN AIR LINES, INC., Lockheed Aircraft Co., General Motors Corporation and United States of America. Eastern Air Lines, Inc., Appellant.
 No. 16328.
 United States Court of Appeals Third Circuit.
 Argued January 20, 1967.
 Decided March 30, 1967.
 Reargued November 28, 1967.
 Decided on Rehearing June 28, 1968.
 Certiorari Denied December 9, 1968.
 
 See 89 S.Ct. 446.
 COPYRIGHT MATERIAL OMITTED J. Grant McCabe, III, Philadelphia, Pa. (Rawle & Henderson, David L. Steck, Philadelphia, Pa., on the brief), for appellant.
 John R. McConnell, Philadelphia, Pa., (Ralph Earle II, John H. Lewis, Jr., Gregory M. Harvey, Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellee.
 Lee S. Kreindler, New York City, (Abram P. Piwosky, Philadelphia, Pa., David M. Hass, Philadelphia, Pa., Kreindler & Kreindler, Lee S. Kreindler, Paul S. Edelman, Milton G. Sincoff, Gerald A. Robbie, Jules Brody, New York City, on the brief), for amici curiae.
 Milton M. Borowsky, Freedman, Borowsky & Lorry, Philadelphia, Pa., for amici curiae on rehearing.
 Before HASTIE, GANEY and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 HASTIE, Circuit Judge.
 
 
 1
 The plaintiff's decedent, a resident of Pennsylvania, returning home on a commercial Eastern Airlines plane, was killed when the plane crashed into the navigable waters of Boston Harbor just after taking off from Boston's Logan Airport on a flight to Atlanta, Georgia, with the first scheduled stop at Philadelphia. Alleging that the fatal accident was caused by negligence and contractual breach of warranty[1] on the part of Eastern, the decedent's administrator sought redress in the United States District Court for the Eastern District of Pennsylvania. Diversity of citizenship was alleged and the action was brought and heard on the "law side" of the district court.
 
 
 2
 The Massachusetts statutes concerning liability for wrongful death and the survival of causes of action, as in effect at the time of the accident, made one whose negligence has caused the death of another liable "in damages in the sum of not less than two thousand nor more than twenty thousand dollars, to be assessed with reference to the degree of his culpability" and also permit recovery of certain expenses incurred as a result of the wrong. Mass.Gen.Laws ch. 228, § 1(2) and ch. 229, § 2. In contrast, the Pennsylvania Wrongful Death and Survival Acts would authorize recovery of the present worth of the anticipated value of the decedent's estate as it would exist at the end of a normal lifetime. 12 P.S. §§ 1601-1604, 20 P.S. § 320.601.
 
 
 3
 The case was tried in two stages. First, a jury considered the question of liability and found for the plaintiff, thus deciding that the negligence of the defendant was a responsible cause of the fatal accident. Thereafter, the question of damages was litigated. The court refused the defendant's request for an instruction to the effect that the nature and extent of the right of recovery should be determined in accordance with the restrictive provisions of Massachusetts law. Instead, the jury was permitted to award full compensation for loss as provided under the Pennsylvania Wrongful Death and Survival Acts. This appeal challenges the correctness of that ruling.
 
 
 4
 We consider first the significance of the fact that the wrong, the hurtful impact of the plaintiff's negligence on the decedent, occurred in or over the navigable waters of Boston Harbor.
 
 
 5
 In Weinstein v. Eastern Airlines, Inc., 3 Cir. 1963, 316 F.2d 758, 759, cert. denied, 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed. 2d 271, a libel arising out of this very accident, we ruled that "an action for wrongful death arising out of the crash of an aircraft in navigable waters within one marine league from shore lies within the admiralty jurisdiction of the United States". Unquestionably, this is a maritime tort within admiralty jurisdiction. However, it is argued by the appellee that because the present complaint has been framed as an action at law under diversity jurisdiction, the existence of admiralty jurisdiction is of no presently controlling consequence. More particularly, it is urged that under Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, the district court sitting in Pennsylvania properly applied Pennsylvania conflict of laws rules to reach the conclusion that the Wrongful Death and Survival Acts of Pennsylvania provide the measure of the plaintiff's right to recover damages.
 
 
 6
 We are not persuaded by this argument. The established rule is that the principles of admiralty law define liability for a maritime tort, whether the proceeding is instituted in admiralty or on the law side of the court. The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S. Ct. 503, 3 L.Ed.2d 524; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Massaro v. United States Lines, 3d Cir., 1962, 307 F.2d 299; J. B. Effenson v. Three Boys Corp., 5th Cir., 1956, 238 F.2d 611. Thus, the circumstance that the tort occurred on navigable water, fortuitous though it was, placed the present controversy within an area regulated by federal rather than state law. This is not changed by the circumstance that the parties are domiciled in different states or that this diversity made it permissible to litigate the matter on the law side of the court.
 
 
 7
 Once the dominance of federal law is recognized, it becomes apparent that the rule and policy of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 and Klaxon Co. v. Stentor Electric Mfg. Co., Inc., supra, are inapplicable. In those cases diversity entitled the litigants to a federal forum but did not cause federal substantive law to rule the issues in controversy. Here, the maritime character of the tort brings the controversy under the governance of federal law and it is immaterial whether admiralty or diversity jurisdiction is relied upon as justification for suing in the federal forum. Obviously, a court thus undertaking to apply federal substantive law would have no occasion to defer to or apply state choice of law rules.
 
 
 8
 We apply this analysis to the solution of the particular problem of this case. Under maritime law negligence causing harm on navigable water is actionable. But historic rules of admiralty law did not recognize such a cause as surviving after the injured person died. Neither did they provide dependents with a right to recover for the loss of the decedent's support. Congress has seen fit to provide a legislative remedy for this deficiency only where death occurs on the high seas. 41 Stat. 537, 46 U.S.C. § 761. Therefore, the federal courts have had to determine whether, when and how maritime law should be shaped to accommodate the claims of dependents and other survivors of deceased victims of maritime torts which occur within the territorial waters of a state rather than on the high seas. This undertaking has resulted in the adoption and consistent application of a novel but simple rule of borrowing. The maritime law will accord dependents and survivors rights of recovery neither more nor less extensive than they would enjoy under the law of the state within whose territorial waters the fatal maritime tort occurred.[2] Hess v. United States, 1960, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305; The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524; Western Fuel Co. v. Garcia, 1921, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; The H. S. Inc., No. 72, 3d Cir., 1942, 130 F.2d 341.
 
 
 9
 Of course some other expedient might have been adopted. Borrowing could have been made from the law of the decedent's domicile or the law of the state whose contacts with the parties, their dealings and the mishap were deemed most significant. But, over the years, the Supreme Court and the inferior courts under its guidance have adhered to the simple rule of borrowing in their entirety the wrongful death and survival rules of the state within whose boundaries the maritime tort occurred.[3]
 
 
 10
 The court below has seen fit to abandon this rule and to substitute another. In our view this was error. Maritime law is national law and its principles should, to the best of judicial ability, be recognized and applied uniformly. While an inferior court is always obligated to conform its judgments to the law as found or declared by the Supreme Court, the national character of maritime law underscores the need for such conformity in this area. If the long and consistently accepted and applied rule of maritime law which requires that the federal right of recovery in such cases as this be measured by the provisions of Massachusetts law is to be modified, that change should be made by the Supreme Court.
 
 
 11
 The judgment will be reversed and the cause remanded for a new trial on the issue of damages.
 
 
 
 Notes:
 
 
 [1]
 On this appeal an agreed "Statement of the Case" asserts that only the claim predicated upon negligence was submitted to the jury and that "the breach of warranty theory was specifically waived by the plaintiff"
 
 
 [2]
 This rule may be subject to the limitation that "a state wrongful death act might contain provisions so offensive to traditional principles of maritime law that the admiralty would decline to enforce them". Hess v. United States, 1960, 361 U.S. 314, 320, 80 S.Ct. 341, 346, 4 L.Ed. 2d 305
 
 
 [3]
 Reflection over a ten year period has persuaded the writer of this opinion that this analysis, rather than the contrasting view expressed in his dissenting opinion in Skovgaard v. The Tungus, 3 Cir. 1957, 252 F.2d 14, 19-20, is sound
 
 
 
 12
 Before STALEY, Chief Judge, and McLAUGHLIN, KALODNER, HASTIE, GANEY, FREEDMAN and SEITZ, Circuit Judges.
 
 OPINION ON REHEARING
 
 13
 STALEY, Circuit Judge.
 
 
 14
 This appeal arises out of wrongful death and survival actions brought by plaintiff-appellee, Donald A. Scott, Administrator of the Estate of Thomas L. Moody, deceased, against defendant-appellant, Eastern Air Lines, Inc. Plaintiff's decedent, a Pennsylvania resident, was killed while returning home aboard a Lockheed Electra aircraft operated by Eastern. The plane crashed into the navigable waters of Boston Harbor shortly after taking off from Boston's Logan Airport on a flight to Atlanta, Georgia, with the first scheduled stop at Philadelphia. Basing jurisdiction on diversity of citizenship, the decedent's administrator brought suit on the "law side" of the United States District Court for the Eastern District of Pennsylvania, alleging that the decedent's fatal injuries were the result of "negligence, breach of warranties, and breach of contract" on the part of Eastern.[1]
 
 
 15
 The following facts are undisputed. Mr. Moody resided in an apartment in Philadelphia from June 1, 1955, until his death. During this period, he was employed by Sears Roebuck & Co. as a territory field man with an office in the Sears' Administration Building in Philadelphia. His ill-fated trip to Massachusetts was taken in furtherance of his employer's business; it concerned the opening of a new store in Sagus, Massachusetts. The ticket on which the decedent was travelling at the time of his death was issued in Philadelphia by Northeast Airlines for a trip from Philadelphia to Boston on October 3, 1960, on Northeast Airlines, and for a return trip from Boston to Philadelphia on October 4, 1960, on the Eastern aircraft.
 
 
 16
 Eastern is incorporated under the laws of the State of Delaware and does business in various states, including Pennsylvania. Its principal place of business is neither in Pennsylvania nor in Massachusetts.
 
 
 17
 At the time of his death, decedent was unmarried and childless. He was, however, survived by a brother, Robert, of Los Angeles, California, who was named as sole beneficiary in decedent's will. The necessary letters of administration were granted by the Register of Wills of Philadelphia County, and an inventory of the estate disclosed that decedent owned personal property situated in Pennsylvania but no real property anywhere. He did, though, at the time of death, have a lease on his apartment in Philadelphia. The debts of the estate, all owing to Pennsylvania creditors, were approximately $1,000. The estate was solvent and paid out over $1,000 in Pennsylvania inheritance taxes. However, the estate did resist a claim by the Commonwealth of Pennsylvania for $4,773.03 in inheritance taxes on decedent's interest in the Sears Roebuck saving and profit sharing pension fund passing out of his estate to beneficiaries residing in North Carolina who had been designated by decedent in accordance with the rules of the plan.
 
 
 18
 The district court tried the case in two stages. First, evidence was heard on the sole issue of liability, with the jury returning a verdict in favor of the plaintiff and against Eastern. This, of course, meant that the negligence of the airline was a proximate cause of Moody's death. Next, after refusing Eastern's request for an instruction to the effect that damages could only be awarded in accordance with the laws of Massachusetts, the district court instructed the jury to award damages in compliance with the laws of Pennsylvania. This they did, rendering a verdict of $2,500 under the Pennsylvania Wrongful Death Act, 12 Purdon's Pa.Stat.Ann. § 1601 et seq., and $45,000 under the Survival Act, 20 Purdon's Pa.Stat.Ann. § 320.601. We are here concerned with the propriety of applying Pennsylvania law to the issue of damages rather than the law of the place of injury, Massachusetts.
 
 
 19
 The question presented to this court is one of some importance. Not only will our decision directly affect the instant litigants, but it may also have an important bearing on the outcome of many other suits arising out of the Eastern Air Lines crash. We have carefully considered the opposing arguments and theories presented at oral argument and in the respective briefs, and have concluded that the ruling of the district court should be affirmed.
 
 I.
 
 20
 The Massachusetts statutes concerning liability for wrongful death and the survival of causes of action, as in effect at the time of the accident, made one whose negligence has caused the death of another liable "in damages in the sum of not less than two thousand nor more than twenty thousand dollars, to be assessed with reference to the degree of his culpability" and also permit recovery of certain expenses incurred as a result of the wrong. Mass.Gen.Laws ch. 228, § 1(2) and ch. 229, § 2. The Massachusetts law is obviously restrictive and penal in nature as it provides for liability, within the specified limits, commensurate with the "degree of culpability." Pennsylvania's Wrongful Death and Survival Acts, on the other hand, are compensatory in nature. As applied to this case, recovery under the Survival Act would include the amount of lost past earnings from the date of death to the date of trial less what the decedent would have probably spent on his own maintenance, plus the amount of future earnings, reduced to present worth, from the date of trial less the probable cost of decedent's maintenance during the time he would have lived. Recovery for the wrongful death would encompass funeral expenses and expenses of administration necessitated by reason of the injuries causing death.
 
 
 21
 With respect to the survival action, it is our view that plaintiff has presented a valid diversity claim under the laws of Pennsylvania. As already noted, the complaint alleged that the decedent's fatal injuries were the result of Eastern's "negligence, breach of warranties, and breach of contract." During the pre-trial proceedings, plaintiff specifically waived his breach of warranty theory, but there is no evidence that there was any waiver of the contract claim. Such a claim is cognizable in assumpsit under Pennsylvania law as a cause of action for breach of contract of nonnegligent carriage. Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964).
 
 
 22
 Eastern, however, argues that under the agreed "statement of the case," which largely constitutes the record on this appeal, there is no basis for finding a contractual obligation between Eastern and the decedent. With this we cannot agree. In Griffith, the Pennsylvania Supreme Court held that in adjudicating a claim based on breach of contract of nonnegligent carriage "* * * [t]he principles which will govern defendant's liability are principles of negligence, not of contract, since the action is for negligent breach, not simple breach, of contract." 416 Pa. at 11, 203 A.2d at 800. A reading of the agreed "statement of the case" discloses that plaintiff alleged in his complaint that decedent's death was caused, among other things, by Eastern's negligence, and at the trial of the cause, he relied upon the issues of Eastern's negligence with respect to: (1) the design and operation of the airplane; (2) the use of this airplane at Logan Airport in view of the known field conditions; and (3) in permitting the airplane to operate with a defective copilot's seat. Since the jury found in favor of plaintiff and against Eastern, this finding perforce had to be predicated on the existence of negligence.
 
 
 23
 The fact that plaintiff did not introduce into evidence a document entitled "contract of carriage" is not fatal to his claim, for the common carrier's contractual obligation to transport its passengers in a nonnegligent manner is not bargained for by the respective parties; rather it is imposed by law. As reiterated in Doughty v. Maine Central Transp. Co., 141 Me. 124, 129, 39 A.2d 758, 759, 157 A.L.R. 759 (1944),
 
 
 24
 "`The law requires the common carrier of passengers to exercise the highest degree of care that human judgment and foresight are capable of, to make his passenger's journey safe. Whoever engages in the business impliedly promises that his passenger shall have this degree of care. * * * The passenger's remedy may be either in assumpsit or tort, at his election.'" (Emphasis added.)
 
 
 25
 Although the Pennsylvania Supreme Court in Griffith did not explicitly refer to the derivation of the carrier's obligation, in holding that Pennsylvania will recognize a claim based on breach of contract of nonnegligent carriage, the court did say,
 
 
 26
 "We cannot perceive, nor has there been brought to our attention, any compelling reason for Pennsylvania to restrict an injured passenger to an action in trespass while, at the same time, a shipper may elect between trespass and assumpsit for damage to goods. * * *" 416 Pa. at 10, 203 A.2d at 800.
 
 
 27
 Robinson Electrical Co. v. Capitol Trucking Corp., 168 Pa.Super. 430, 79 A.2d 123 (1951), is the Pennsylvania decision which held that a shipper of goods could elect between trespass and assumpsit. In that case, the court said:
 
 
 28
 "The liability of a common carrier for goods entrusted to it for transportation does not arise from contract, but is cast upon the carrier by the law. * * * An action either ex delicto or ex contractu will lie for breach of the carrier's duty. * * *" 168 Pa. Super. at 433, 79 A.2d at 125. (Emphasis added.)
 
 
 29
 Since it is clear that a shipper of goods impliedly promises that the goods will be transported in a nonnegligent manner, the conclusion is inescapable that an airline also impliedly promises that its passengers will be carried in a nonnegligent fashion. No amount of sophisticated argumentation can convince us that Pennsylvania imposes a higher duty of care with regard to the shipment of goods than it does with respect to the carriage of passengers. Indeed, such a value priority would be unthinkable in this day and age. In light of the foregoing discussion, therefore, we think that plaintiff, under the facts of this case, did all that was required of him to establish his state-related claim of breach of contract of nonnegligent carriage. He alleged the breach of contract, he introduced into evidence the airplane ticket purchased by decedent in Philadelphia and he proved that the negligent breach of Eastern's implied promise constituted a proximate cause of decedent's death. Nothing else need have been done.
 
 
 30
 Now the argument has been advanced that the Pennsylvania Supreme Court in the Griffith case seemed to adopt the old common law procedural device of waiving the tort and permitting recovery in assumpsit in order to enable Pennsylvania law to control recovery sought by a paying passenger for negligent injury suffered at the hand of a common carrier. It is contended under this argument that Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), did not go so far as to require a federal court seeking to redress a maritime tort to accept Pennsylvania's invocation of an ancient device of common law pleading to accomplish a fictitious transmutation of a suit on a maritime tort into a suit on civil contract with resultant abdication of federal authority over maritime mishaps. This theory, though adroitly phrased and vigorously asserted, is not a perplexing one as we think this court decisively settled the issue in Weinstein v. Eastern Airlines, Inc., 316 F.2d 758 (C.A. 3), cert. denied, 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1963). In that case, plaintiffs, alleging maritime jurisdiction, sought redress in the federal district court on claims involving tort, breach of contract, and breach of warranty. The district court dismissed the actions as being not within the maritime jurisdiction, 203 F.Supp. 430. On appeal, this court, speaking through Chief Judge Biggs, held that although the tort claims under consideration fell within admiralty jurisdiction.
 
 
 31
 "* * * a contract or warranty relating to the airframe or power plant of a land-based aircraft and a contract of carriage by air between two cities on the United States mainland are not maritime in substance, nor are such contracts and warranties made maritime by virtue of the fact that the aircraft in question flew briefly over navigable waters en route from Boston to Philadelphia." 316 F.2d at 766. (Emphasis added.)
 
 
 32
 Proper judicial administration commands that once the expectation is established that a particular claim is state-created and not maritime in nature, that expectation will not be dashed except for the most compelling of reasons. And since we think that Weinstein accurately distinguished between tort claims that are maritime in nature and contract claims that are not, we hold that recognition of the diversity claim for breach of contract of nonnegligent carriage can in no sense be construed as an abdication of federal authority over maritime torts.
 
 
 33
 As the contractual claim against Eastern is rooted in Pennsylvania law, it is governed directly by the teaching of Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), which directs district courts to look to the choice of law rule of the state in which it sits. Pennsylvania's rule was articulated in the now familiar case of Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964). In Griffith, the plaintiff's decedent purchased a ticket from United in Philadelphia for a flight from Philadelphia to Phoenix, Arizona, and return. On the way to Phoenix, the decedent met immediate death when the plane crashed in the course of landing at Denver, Colorado, a scheduled stop. The issue before the court in Griffith was whether Pennsylvania or Colorado law should govern the amount of recoverable damages. In reasoning toward the ultimate conclusion that Pennsylvania law controlled, the court stated:
 
 
 34
 "* * * the strict lex loci delecti rule should be abandoned in Pennsylvania in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court. * * *" 416 Pa. at 21, 203 A.2d at 805.
 
 
 35
 The court wisely avoided the pitfall of substituting one rigid rule for another, but did go on to rely upon a balance of the following factors: the interests of the place of the injury; the interests of the place where the relationship was created; the domicile of decedent and his family; the place of the administration of the decedent's estate; and the domicile of the decedent's surviving dependents.
 
 
 36
 Aside from the obvious factual similarity between Griffith and the instant case, it becomes apparent when we apply Pennsylvania's interest and policy analysis to the facts of this case, Pennsylvania "has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." See McSwain v. McSwain, 420 Pa. 86, 94, 215 A.2d 677, 682 (1966). The only arguable factor pointing to the application of Massachusetts law is that Massachusetts was the place of injury. Under Pennsylvania law, however, this factor in itself does not necessarily create a legal interest in favor of the application of Massachusetts law. For example, in Kuchinic v. McCrory, 422 Pa. 620, 222 A.2d 897 (1966), a case concerning actions for the death of Pennsylvania domiciliaries killed in an airplane crash in Georgia, the court, in holding that Pennsylvania law applied, stated that "under no stretch of the imagination can Georgia be viewed as a concerned jurisdiction," 422 Pa. at 624, 222 A.2d at 899, and implied that the Griffith case, like Kuchinic, exemplified a "false conflict" where the place of injury had only "nominal contacts with the transaction." 422 Pa. at 624 n. 4, 222 A.2d at 899 n. 4.
 
 
 37
 When the facts of this case are juxtaposed with those of Griffith and Kuchinic, it becomes evident that the conflict here is just as "false" as it was there. Appellant's argument that Massachusetts has a substantial interest in view of the underlying policy of its Wrongful Death Act to deter potential tortfeasors from engaging in tortious conduct in Massachusetts is unpersuasive. If deterrence is, as it seems to be, the underlying policy of the Massachusetts act, see Hudson v. Lynn & B. R. R. Co., 185 Mass. 510, 71 N.E. 66 (1904), there can be no impingement upon this policy by exposing appellant to Pennsylvania's more liberal, compensatory measure of damages. Indeed, liability for compensatory damages is in itself a deterrent against tortious conduct, and appellant cannot reasonably contend that it and other airlines will be less careful in regulating their conduct because the Pennsylvania measure of damages, rather than that of Massachusetts, has been held to apply to the instant and similar transactions.
 
 
 38
 Equally unpersuasive is appellant's argument that constitutional limitations would preclude Pennsylvania courts from applying Pennsylvania law to this case. In Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), involving actions for deaths in an airplane crash in Missouri allegedly caused by negligent acts occurring in Oklahoma, the Supreme Court of the United States held:
 
 
 39
 "* * * Where more than one State has sufficiently substantial contact with the activity in question, the forum State, by analysis of the interests possessed by the States involved, could constitutionally apply to the decision of the case the law of one or another state having such an interest in the multistate activity. * * *" 369 U.S. at 15, 82 S.Ct. at 594
 
 
 40
 Without elaborate discussion, we think it sufficient to say that the facts before us reveal that Pennsylvania has "sufficiently substantial contact with the activity in question," and under the rule of International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), as applied in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), we hold that application of Pennsylvania law violated neither the Due Process nor the Full Faith and Credit clauses of the United States Constitution.
 
 II.
 
 41
 Although the issue was not extensively discussed by any of the parties in their briefs, we think that plaintiff also presented and proved a valid diversity claim under the Pennsylvania Wrongful Death Act. 12 Purdon's Pa.Stat.Ann. § 1601 et seq. The Act provides in part:
 
 
 42
 "Whenever death shall be occasioned by unlawful violence or negligence, * * * the widow of any such deceased, or if there be no widow, the personal representatives may maintain an action for and recover damages for the death thus occasioned." 12 Purdon's Pa.Stat.Ann. § 1601. (Emphasis added.)
 
 
 43
 The statute makes it quite clear that proof of unlawful violence or negligence is necessary if one is to recover under its provisions. Similarly, in Griffith v. United Air Lines, Inc., supra, the Pennsylvania Supreme Court made its just as clear that a finding of negligence is essential for recovery under the Survival Act when proceeding on the theory of breach of contract of nonnegligent carriage. As earlier observed, the court explicitly stated that "[t]he principles which will govern defendant's liability are principles of negligence, not of contract, since the action is for negligent breach, not simple breach, of contract." 416 Pa. at 11, 203 A.2d at 800. Thus, the only logical conclusion that we can draw is that the negligent breach sufficient to satisfy the Survival Act is also sufficient to satisfy the Wrongful Death Act. Appellant, however, argues that such is not the law of Pennsylvania. But since appellant cited no cases in the short space devoted to this contention,[2] we cannot be absolutely sure as to what authority it relies on. Our own research, however, leads us to believe that the argument is bottomed upon two relatively recent Pennsylvania cases concerning assumpsit actions for wrongful death allegedly caused by breach of various warranties. Miller v. Preitz, 422 Pa. 383, 221 A.2d 320 (1966); DiBelardino v. Lemmon Pharmacal Co., 416 Pa. 580, 208 A.2d 283 (1965). The issue in Lemmon Pharmacal, supra, was whether an action for wrongful death could be brought in assumpsit based upon an alleged breach of an implied warranty of fitness for use. In holding that the action was impermissible in Pennsylvania, the court stated:
 
 
 44
 "* * * In our view, the legislature intended to create a right of action where death has resulted from a tortious act and that damages arising therefrom are recoverable only in an action in trespass." 416 Pa. at 585, 208 A.2d at 285-86. (Emphasis theirs.)
 
 
 45
 In Miller v. Preitz, supra, decedent's administrator brought actions in assumpsit under the Wrongful Death and Survival statutes for damages allegedly resulting from breaches of implied warranties of merchantability. Addressing itself to the administrator's election to frame the wrongful death action in assumpsit, the Pennsylvania Supreme Court ruled:
 
 
 46
 "On the basis of our decision in DiBelardino v. Lemmon Pharmacal Co., 416 Pa. 580, 208 A.2d 283 (1965), the lower court properly sustained preliminary objections to plaintiff's `Wrongful Death' count. In Lemmon Pharmacal we held that the right of action provided by the `Wrongful Death' statute could be brought only in trespass and that, therefore, an action in assumpsit for breach of warranty was inappropriate. * * *" 422 Pa. at 386-387, 221 A.2d at 322.
 
 
 47
 We assume that appellant would rely heavily on the above-quoted passages to support the position that a contractual claim of any nature could not possibly invoke the remedies afforded by the Pennsylvania Wrongful Death Act. It is our opinion, however, that the Pennsylvania courts would not view the issue in such a constricted, myopic manner, for to do so would, in effect, amount to a repudiation of the progressive policies espoused in Griffith and a reversion to the now discredited practice of raising form above substance. Such an approach was eschewed by the court in Griffith when it said:
 
 
 48
 "* * * The essentials of this case [negligent breach of contract] remain the same regardless of its label. Mere technicalities of pleading should not blind us to the true nature of the action. The choice of law will be the same whether the action is labeled trespass or assumpsit." 416 Pa. at 11, 203 A.2d at 800.
 
 
 49
 Using this latter frame of reference, it becomes apparent that "the essentials of this case" are similar to those of Griffith but are obviously distinguishable from those of Lemmon Pharmacal and Preitz, Both Lemmon Pharmacal and Preitz involved wrongful death claims for breach of warranty; in neither case was negligence alleged nor proved. In both cases, the court referred to the wording of the Pennsylvania Wrongful Death Act and concluded that recovery under its provisions could only be permitted upon a showing of unlawful violence or negligence. Negligence, of course, is the essence of the present claim, just as it was in Griffith. The instant plaintiff not only alleged but proved negligent breach of contract. By so doing he established his diversity right to recover under the Pennsylvania Wrongful Death Act.
 
 III.
 
 50
 It is our opinion, separate and independent of our views on the contractual diversity claims, that the district court's choice of Pennsylvania law should also be affirmed on the basis of the applicability of Federal maritime principles to "the tort claims sub judice." Weinstein v. Eastern Air Lines, Inc., 316 F.2d 758, 766 (C.A.3), cert. denied, 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1963). In Weinstein, it was clearly held that if fatal injuries are sustained upon navigable waters, tort claims for those injuries are maritime in nature. And although this suit was brought as an action at law, maritime principles will govern the tort aspects of the case, since admiralty standards define liability for a maritime tort, whether the proceeding is instituted in admiralty or on the law side of the court. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Massaro v. United States Lines Co., 307 F.2d 299 (C.A.3, 1962); J. B. Effenson Co. v. Three Bays Corp., 238 F.2d 611 (C.A.5, 1956).
 
 
 51
 Aside from certain Congressional enactments, inapplicable here,[3] maritime law confers no right of action for wrongful death in state territorial waters. Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); The Harrisburgh, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886). Instead, as we recently pointed out in United New York Sandy Hook Pilots Ass'n v. Rodermond Industries, Inc., 394 F.2d 65 (C.A.3, 1968), admiralty courts have traditionally entertained death actions "by permitting the wrongful death statute of the state in which the death occurred to supplement the general maritime law. Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921). In these situations, maritime law adopts the state statute, and enforces it `as it would one originating in any foreign jurisdicdiction.' Levinson v. Deupree, 345 U.S. 648, 652, 73 S.Ct. 914, 97 L.Ed. 1319 (1953). * * *"
 
 
 52
 Eastern contends that since the fatal mishap occurred in the territorial waters of Massachusetts, that state's law, not Pennsylvania's, should have been chosen by the district court to supplement the general maritime law. It asserts that this contention is supported by its inability to find one reported case in this Circuit involving death upon state navigable waters where we have not applied the death statute of the state where the tort occurred. See, e. g., Meehan v. Gulf Oil Corp., 312 F.2d 737 (C.A.3, 1963); Hill v. Waterman S. S. Corp., 251 F.2d 655 (C.A.3, 1958), cert. denied, 359 U.S. 927, 79 S.Ct. 603, 3 L.Ed.2d 629 (1959); Curtis v. A. Garcia Y. Cia, 241 F.2d 30 (C.A.3, 1957); The H. S., Inc., No. 72, 130 F.2d 341 (C.A.3, 1942); Klingseisen v. Constanzo Transp. Co., 101 F.2d 902 (C.A.3, 1939). But such a negative argument can hardly buttress Eastern's position, since none of the above-cited cases considered the question of whether any state law other than that of the place of injury governed the rights and duties of the parties. Concededly, it was stated in The H. S., Inc., No. 72, 130 F.2d at 343, that this court "made plain in Klingseisen v. Constanzo Transportation Co., supra, he who seeks to recover in admiralty under a State death statute for a maritime tort may do so only in accordance with the law of the State in which the tort occurred," but analysis of the Klingseisen decision clearly shows that the court there went no further than to hold that when a plaintiff brings suit in admiralty under the Pennsylvania Wrongful Death Act, he is bound by the conditions and limitations of that statute, including the rule which bars recovery if the decedent was contributorily negligent. In view of this analysis, the above-quoted statement made by this court in The H. S., Inc., No. 72, is obviously obiter dictum, and therefore does not constitute binding precedent in the consideration of the question now before us. What is significant about Klingseisen and other cases relied upon by appellant is that they are all chiefly concerned with the degree to which maritime law will adopt and enforce the law of a particular state; they are not, nor do they purport to be, authoritative guides for choosing between competing state statutes.
 
 
 53
 Appellant next suggests that we should follow what it considers to be a recognition by the Supreme Court in The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959), of a Congressional intent, in enacting the Death on the High Seas Act, 41 Stat. 537, 46 U.S.C. §§ 761-767, to leave to the several States the power [presumably exclusive] to provide for claims arising out of fatal injuries sustained in their respective territorial waters. The problem before the Supreme Court in The Tungus involved, not a multistate conflict, but the interrelationship of maritime law with the law of a particular state, New Jersey. The decedent in The Tungus was fatally injured while aboard a vessel located in the navigable waters of New Jersey. His administratrix brought suit in admiralty under the Wrongful Death Act of New Jersey; no other state's law was relied upon. However, the administratrix did argue, in the alternative, that if the New Jersey Wrongful Death Act did not permit recovery, the federal courts could apply instead the full corpus of the maritime law so long as the state had enacted some type of wrongful death statute. This latter alternative, the Court believed, would conflict with "a clear congressional purpose," disclosed by the legislative history of the Death on the High Seas Act,
 
 
 54
 "* * * to leave `unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States.' S.Rep. 216, 66th Cong., 1st Sess. 3; H.R.Rep. No. 674, 66th Cong., 2d Sess. 3. The record of the debate in the House of Representatives preceding passage of the bill reflects deep concern that the power of the States to create actions for wrongful death in no way be affected by enactment of the federal law. 59 Cong. Rec. 4482-4486." 358 U.S. at 593, 79 S.Ct. at 507.
 
 
 55
 From our examination of the legislative history, we think it apparent that Congress, in enacting the Death on the High Seas Act, was primarily concerned with creating a federal right of action for death on the high seas that would not encroach upon the sovereignty of the states over deaths caused by maritime torts within state territorial waters.[4] The Court in The Tungus merely reflected this concern over retaining state sovereignty by rejecting the idea that federal maritime law could completely supplant and render inoperative the conditions and limitations of state death enactments. Given the nature and purpose of the Act, we do not think that Congress contemplated, much less intended, precluding the application of one state's death act to a maritime tort occurring in the territorial waters of another state when the former state has significant contacts with the parties and a substantial interest in the issue involved. We are even more certain that the Supreme Court in The Tungus attributed no such intent to Congress.
 
 
 56
 In our judgment, the necessary guidance for the proper disposition of this question has been furnished by the Supreme Court, not in The Tungus, but in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). In Lauritzen, supra, the central issue was what law should be applied to the Jones Act claim of a Danish seaman who, after joining a Danish vessel in an American port, was injured in the harbor of Havana, Cuba. The Court began its analysis of the various factors which, alone or in combination, generally influence the choice of law to govern a maritime tort claim upon the premise that
 
 
 57
 "* * * Maritime law, like our municipal law, has attempted to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved. * * *" 345 U.S. at 582, 73 S.Ct. at 928.
 
 
 58
 After reviewing the "connecting factors which either maritime law or our municipal law of conflicts regards as significant in determining the law applicable to a claim of actionable wrong," the Court held there was "an overwhelming preponderance in favor of Danish law. * * *" 345 U.S. at 592, 73 S.Ct. at 933. Among the factors which the Court considered as possible sources of significant contact were: law of the flag, allegiance or domicile of the injured, allegiance of the defendant shipowner, place of contract, inaccessibility of foreign forum, the law of the forum, and the place of the wrongful act. In rejecting the place of the wrongful act as a predominant factor in determining the law governing maritime tort claims, the Court noted that the lex loci delicti commissi rule would indicate application of the law of Cuba, a country which had far fewer significant contacts with the injured seaman then did Denmark. The Court stated: "The test of location of the wrongful act or omission, however sufficient for torts ashore, is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate." 345 U.S. at 583, 73 S.Ct. at 929.
 
 
 59
 Six years later, in Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468 (1959), the Court again depreciated the importance of the place of injury. Romero, a Spanish seaman who was injured aboard a vessel of Spanish flag owned by a Spanish corporation, while the vessel was temporarily berthed in New York, sued the shipowner in the United States District Court in New York under the Jones Act and the general maritime law of the United States. Reasoning toward its conclusion that Spanish law governed Romero's claims against the shipowner, the Court stated: "The broad principles of choice of law and the applicable criteria of selection set forth in Lauritzen were intended to guide courts in the application of maritime law generally." 358 U.S. at 382, 79 S.Ct. at 485.
 
 
 60
 Guided by this precept, the Court of Appeals for the Fourth Circuit in McClure v. United States Lines Co., 368 F.2d 197 (C.A.4, 1966), a maritime death action, held that the choice of law rule enunciated in Lauritzen dictated a rejection of the law of France, the place of injury and death, in favor of the application of American maritime law, because "[a]ll of the really significant relationships are with this country, not with France." 368 F.2d at 201.[5] In reaching this decision, the court observed that
 
 
 61
 "* * * Lauritzen and Romero were forerunners of a general reappraisal and revision of the choice of law rules. * * *
 
 
 62
 "Under the new approach the laws of the wrong will be applied in wrongful death and personal injury actions `unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved * * *.' In some factual situations, the place of the wrong may be quite adventitious, and all really significant relations may be with some other state." 368 F.2d at 201.
 
 
 63
 As indicated earlier, we think the facts of the instant case exemplify a situation where the place of the wrong was quite adventitious and where the most significant relations and contacts are with Pennsylvania rather than with Massachusetts. Pennsylvania is the state in which the contractual relationship between the decedent and Eastern arose; it is the situs of decedent's domicile; and of the administration of his estate. The fact that the place of injury is one other than the jurisdiction whose law is being applied is no more significant here than it was in Lauritzen and Romero. And in view of the broad choice of law principles enunciated in Lauritzen and Romero, we think the maritime law was correctly supplemented by the adoption and enforcement of Pennsylvania's Wrongful Death and Survival Acts.
 
 
 64
 Our reliance upon Lauritzen and Romero is fortified by the realization that these two cases were in the vanguard of many recent enlightened decisions attacking the usefulness and justice of rigid adherence to the strict lex loci delicti rule.[6] Equally as important in this regard is that an analysis of Eastern's position here reveals that it is essentially championing a vested rights approach to maritime wrongful death and survival actions. Historically, this approach, as embodied in the rule of lex loci delicti, dictated that the law of the place of the tort would invariably govern, because it was believed that the right to recover for a foreign tort was created or withheld by the law of the jurisdiction where the injury occurred. Application of this concept permitted of simplicity, uniformity, and predictability, but too often failed to take cognizance of legitimate interests of other states.[7] As a result, jurisdiction after jurisdiction has abandoned this simplistic approach in favor of more sophisticated, meaningful, and realistic choice of law criteria.[8] This trend was recognized and encouraged by the Supreme Court in Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), wherein the Court was called upon to determine whether the words "law of the place," as contained in the Federal Tort Claims Act, embraced the whole law of the place where the negligence occurred including its choice of law rules, or only the internal law. After first noting the then-nascent trend of state departure from the lex loci delicti rule "in order to take into account the interest of the State having significant contact with the parties to the litigation," 369 U.S. at 12, 82 S.Ct. at 592, the Court held that the "law of the place" included not only the internal law but also the choice of law rules of the state. This interpretation, the Court believed, provided the necessary flexibility "[s]hould the States continue this rejection of the older rule in those situations where its application might appear inappropriate or inequitable." 369 U.S. at 13, 82 S.Ct. at 593.
 
 
 65
 Admiralty courts, like state courts, have an obligation to refrain from applying a rule when its application would be "inappropriate or inequitable." We strongly believe that it would be most inappropriate, if not inequitable,[9] to apply the law of Massachusetts to this case simply because Eastern's aircraft happened to crash into that state's navigable waters.
 
 
 66
 Accordingly, the judgment of the district court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Plaintiff abandoned his breach of warranty theory before the case came to trial
 
 
 [2]
 Eastern's basic contention is as follows: "* * * Any rights to recover for wrongful death are rights created purely by statute for the benefit of designated beneficiaries. Any rights of statutory beneficiaries arise from statute and not from any contractual relationship with appellant or from any notion that they were by intention of the parties the third party beneficiaries of any contractual provisions."
 
 
 [3]
 The Jones Act, 41 Stat. 1007, 46 U.S.C. § 688, creates rights only for seamen. The Death on the High Seas Act, 41 Stat. 537, 46 U.S.C. §§ 761-767, applies only where the fatal injuries are sustained outside the territorial waters of the United States. And, as might be imagined, this suit does not concern those rights conferred by the Longshoremen's and Harbor Workers' Act, 44 Stat. 1424 et seq., 33 U.S.C. § 901 et seq
 
 
 [4]
 For an informative summary of the Act's legislative history, see Wilson v. Transocean Airlines, 121 F.Supp. 85 (N.D.Calif., 1954)
 
 
 [5]
 A similar approach was followed by the Court of Appeals for the Fifth Circuit in Symonette Shipyards, Ltd. v. Clark, 365 F.2d 464 (C.A.5, 1966), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967). There, two American seamen were injured, one of them fatally, "on a ship registered in and flying the flag of the Bahamas and actually owned by a citizen of that country," "following a stop at Nassau for unloading of cargo." 365 F.2d at 467. The court held that American law applied because it believed the most significant choice of law factor to be, not the place of injury, but the nationality of the injured and deceased seamen
 
 
 [6]
 The Restatement (Second), Conflict of Laws, citesLauritzen and Romero as examples of "[c]ases emphasizing the importance of applying the local law of the state which has the dominant interest in the decision of the particular issue * * *." Restatement (Second), Conflict of Laws, § 145, Reporter's note at 20 (Proposed Official Draft, Part II, 1968). And the fourth edition of Goodrich, Conflict of Laws, relies heavily upon Lauritzen as a leading case in the formulation of the rule "that the law by which the forum is guided in determining the issues in tort cases is that of the state which is most significantly related to the issue * * *." Goodrich, Conflict of Laws, § 92 at 166; see also § 93 at 168 n. 16 (4th ed. Scoles 1964).
 
 
 [7]
 A lucid, critical analysis of the vested rights theory appears in Cook, The Logical and Legal Basis of the Conflict of Laws, ch. 1 & 13 (1942)
 
 
 [8]
 See, e. g., Watts v. Pioneer Corn Co., 342 F.2d 617 (C.A.7, 1965) (construing Indiana law); Reich v. Purcell, Cal., 63 Cal.Rptr. 31, 432 P.2d 727 (1967); Wartell v. Formusa, 34 Ill.2d 57, 213 N.E.2d 544 (1966); Wessling v. Paris, 417 S.W.2d 259 (Ky.1967); Balts v. Balts, 273 Minn. 419, 142 N.W.2d 66 (1966); Clark v. Clark, 107 N.H. 351, 222 A.2d 205 (1966); Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A.L.R.2d 1 (1963); Casey v. Manson Constr. & Engineering Co., 428 P.2d 898 (Or.1967); Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964); Haumschild v. Continental Casualty Co., 7 Wis.2d 130, 95 N.W.2d 814 (1959)
 For an informative and interesting analysis of decision-making in conflicts cases, see Cavers, The Choice-of-Law Process (1965). See also Leflar, Choice-Influencing Considerations in Conflicts Law, 41 N.Y.U.L.Rev. 267 (1966); Leflar, Conflicts Law: More on Choice-Influencing Considerations, 54 Cal.L.Rev. 1584 (1966).
 
 
 [9]
 In view of what has been decided, it is unnecessary for us to reach the question of whether the Massachusetts Wrongful Death Act is so offensive to traditional principles of maritime law that admiralty should decline to enforce it
 
 
 
 67
 FREEDMAN, Circuit Judge (concurring).
 
 
 68
 I join in the affirmance of the judgment of the district court.
 
 
 69
 The opinions of Judge Staley and Judge Seitz present different reasons for the award of damages under the Pennsylvania wrongful death and survival statutes. Judge Staley's view is that while a tort action falls within the maritime law, an action may also be sustained under state law for the negligent breach of the contract of carriage which is outside the admiralty jurisdiction and therefore subject to the state choice of law rule. Judge Seitz would apply the state choice of law rule to all the claims because the action is on the law side of the court under the diversity jurisdiction and therefore is outside the admiralty jurisdiction. Chief Judge Hastie's dissent would apply maritime law to the tort action, but disagrees with Judge Staley's recognition of the right to waive the tort and sue in assumpsit, on the ground that it removes what is essentially a tort action from the pre-emptive jurisdiction of admiralty by a simple change in designation as an action for negligent breach of contract. Since the case would therefore be controlled by maritime law, the dissent would apply what it believes to be the well settled admiralty choice of law doctrine that the law of the place where the accident occurred governs.
 
 
 70
 I believe it is unnecessary to decide whether maritime law or state law applies because I reach the same result in either case.
 
 
 71
 If state law applies, either for the reasons given in Judge Staley's opinion or those given in Judge Seitz's opinion, I agree with them that the forum court must apply Pennsylvania's conflicts rules which under Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964), would invoke the so-called contacts doctrine and render the Pennsylvania rather than the Massachusetts law of damages applicable under the facts in this case. If federal maritime law applies, I would reach the same result because I agree with Judge Staley that the choice of law should in such a case also be made under the contacts doctrine. Maritime law has exhibited a healthy capacity for development and growth and should not be immunized against acceptance of the now fully evolved theory of contacts in place of the rigid, simplistic principle of lex loci delicti.[1] It was unrealistic enough to apply to the fast moving automobile the rule of lex loci delicti which arose in the days of the horse and buggy. It seems to me even more extreme to apply the doctrine to airplanes which fly so high and at such tremendous speeds that state boundaries are invisible and are crossed without even being noticed.
 
 
 72
 In either case, therefore, whether by the application of state choice of law rules or maritime choice of law, I believe the award of damages was properly made under Pennsylvania's wrongful death and survival statutes.
 
 
 
 Notes:
 
 
 [1]
 See my dissenting opinion in Mack Trucks, Inc. v. Bendix-Westinghouse Auto. A. B. Co., 372 F.2d 18, 21 (3 Cir.), cert. denied, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967)
 
 
 
 73
 SEITZ, Circuit Judge (concurring).
 
 
 74
 Contrary to my evaluation of the matter as a member of the panel which originally decided this case, I am now convinced that plaintiff's claims were also properly cognizable under the diversity jurisdiction of the district court; the factual prerequisites admittedly being present.
 
 
 75
 It is clear that the district court applied state law principles (Pennsylvania) in submitting the damage issue to the jury. Since the plane crashed into the navigable waters of the State of Massachusetts, the basic question then is whether maritime law precluded the assertion and recognition of state created rights of action under the district court's diversity jurisdiction.
 
 
 76
 It is clear that a right of action under maritime law arose as a result of this accident and could have been asserted under the admiralty jurisdiction of the district court. Weinstein v. Eastern Airlines, Inc., 316 F.2d 758 (3rd Cir.), cert. denied 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1963). But it does not follow that recognition of a state common law right of action entertained under diversity jurisdiction was thereby foreclosed.* On the contrary, subject to exceptions hereinafter noted, it has been established for many years that such a party
 
 
 77
 "* * * may, at his election, proceed in an action at law, either in the Circuit Court if he and the defendant are citizens of different States, or in a State court as in other cases of actions cognizable in the State and Federal courts exercising jurisdiction in common law cases, as provided in the eleventh section of the Judiciary Act. He may have an action at law, in the case supposed, either in the Circuit Court or in a State court, because the common law in such a case is competent to give him a remedy, and wherever the common law in such a case is competent to give a party a remedy, the right to such a remedy is reserved and secured to suitors by the saving clause contained in the ninth section of the Judiciary Act [footnotes omitted]." Steamboat Co. v. Chase, 16 Wall. 522, 533, 21 L.Ed. 369 (1872).
 
 
 78
 Certainly state-created remedies may not be invoked if maritime law has preempted the particular area involved. But I cannot find that the existence of a maritime right of action here (which as to the death claim must itself borrow a state statute) is so at war with the state right of action that the maritime law must be considered exclusive. Given the fact that the claim arose from the death of a passenger on a commercial airplane which crashed into the navigable waters of a state, there would seem to be no basis for an overriding concern for the exclusive application of maritime law. Recognition of the state law claim works no impingement upon the rights of seamen and maritime workers. Indeed, it in no wise forecloses the assertion of the maritime rights of the plaintiff in the event he should elect to have the matter determined by such principles. But he asserts his state law rights. In the premises there seems to be no reason why, if he so elects, as here, his action may not be maintained as a state law action under the district court's diversity jurisdiction.
 
 
 79
 The approach here taken seems to find explicit support in a long line of United States Supreme Court opinions. See the general discussion by Mr. Justice Frank-furter in Romero v. International Term. Co., 358 U.S. 354, 359-381, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), and see Mr. Justice Brennan's statement on page 398; Just v. Chambers, 312 U.S. 383, 389, 61 S.Ct. 687, 85 L.Ed. 903 (1941); Norton, Assignee v. Switzer, 93 U.S. 355, 23 L.Ed. 903 (1876); Steamboat Co. v. Chase, above. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953) is here instructive. The court held that a longshoreman's claim for negligence for an on-duty injury was governed by maritime law. However, the court noted particularly that the plaintiff's "complaint asserted no claim created by or arising out of Pennsylvania law." The court did go on to say that "Even if Hawn [plaintiff] were seeking to enforce a state-created remedy for this right, federal maritime law would be controlling." (p. 409, 74 S.Ct. p. 205) First, I note that this case involved an attempt to apply the state common law defense of contributory negligence. Its application was held to be incompatible with maritime principles. But of more importance here, the court went on to say "While states may sometimes supplement federal maritime policies[3] a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court." In its footnote 3 the court cited, inter alia, Just v. Chambers, 312 U.S. 383, 387-392, 61 S.Ct. 687 (1941). It is noteworthy that the discussion on pages 387 to 392, to which the Supreme Court refers, includes an explicit recognition that state created rights of action for wrongful death, inter alia, may be asserted even though the wrong occurred in the navigable waters of a state, and this is so apart from maritime law. I am therefore satisfied that the claim here asserted did not lose its vitality as a state law claim because it arose from an accident occurring in the navigable waters of a state. Nor do I think the language in footnote 7 in Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed. 2d 305 (1960) can be considered to constitute an overruling of the long line of Supreme Court opinions to which I have referred. The court did state, inter alia, in the footnote:
 
 
 80
 "There can be no question but that Oregon would be required to apply maritime law if this were an action between private parties, since a tort action for injury or death occurring upon navigable waters is within the exclusive reach of maritime law. The Plymouth, 3 Wall. 20, 35, 36, 18 L.Ed. 125."
 
 
 81
 I read that language to mean that where the matter is asserted as a matter of maritime law the tort action is governed exclusively by maritime law principles. I do not read it to mean that all state remedies are thereby foreclosed.
 
 
 82
 I therefore conclude, as plaintiff contends, that his claim was properly cognizable as a state law claim and thus properly within the district court's diversity jurisdiction under the present facts. My analysis would seem to render inapplicable such cases as Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922).
 
 
 83
 The appellant does not challenge any aspect of the finding of liability on this appeal. The issue relates solely to the applicable law of damages. It is clear that in determining such issue under its Survival Statute, Pennsylvania will apply its so-called "contacts" doctrine. Griffith v. United Airlines, 416 Pa. 1, 203 A.2d 796 (1964). I agree with Judge Staley's opinion that the facts here amply justified the district court, as a matter of Pennsylvania law, in finding that Pennsylvania would apply its own law to the damage issue. I am equally satisfied that, under Griffith, Pennsylvania would apply its "contacts" doctrine to the determination of the damage issue under its Wrongful Death Statute. This being so, I think the district court was equally justified under the established facts in applying Pennsylvania law to that damage claim.
 
 
 84
 I therefore conclude that the Pennsylvania law was properly applied by the district court to the damage issues here. I am also satisfied, under the circumstances, that this did not constitute any violation of the appellant's constitutional rights. I emphasize that my opinion is not intended to indicate any view with respect to the constitutionality of the application of the "contacts" doctrine on the issue of liability.
 
 
 85
 Finally, since I believe the judgment below can be affirmed without consideration of any issue of substantive maritime law, I need not decide what state law would be "borrowed" in the event maritime law was deemed controlling.
 
 
 86
 I vote to affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 *
 See the "Saving Clause" in 28 U.S.C.A. § 1333
 
 
 
 87
 HASTIE, Chief Judge, with whom McLAUGHLIN and GANEY, Circuit Judges, join, dissenting.
 
 
 88
 Because final disposition of this and numerous companion cases has been so long delayed by the need for judicial disposition of various important legal questions that the parties to this litigation have raised and contested seriatim in trial and appellate courts, this statement of dissenting views has been drafted more summarily and with less documentation than otherwise might have been desirable. Moreover, the basic supporting argument has already been stated in the opinion promulgated March 30, 1967 by the then unanimous panel of this court which originally heard this appeal. Adhering to that view of the case, we who now dissent are content merely to supplement that opinion with a short statement of what we believe to be the basic errors in the analysis of the present majority.
 
 
 89
 The majority opinion reasons that this action in a United States District Court for the wrongful death of a passenger, negligently caused when the appellant's commercial aircraft crashed in navigable water of Boston harbor, may properly be adjudicated as a diversity action on a Pennsylvania contract, with the result that the federal court is obligated to apply Pennsylvania rules of choice of law and to grant the relief and remedy which Pennsylvania law provides for damage caused by a breach of contract. Thus, the proper characterization of the wrong in suit as a maritime tort, or a breach of contract, or either at judicial pleasure, is an important, perhaps decisive, threshold question.
 
 
 90
 The contractual theory of liability is that the carrier breached a promise it had made to the passenger that it would not be negligent in transporting him. The main trouble with that argument is that the alleged promise is a legal fiction. The majority opinion concedes this, fairly stating that no contract of carriage was in evidence and no finding was made that the alleged contract of carriage did in fact include any such promise. Indeed, in the words of the majority opinion, "the common carrier's contractual obligation to transport its passengers in a non-negligent manner is not bargained for by the respective parties; rather it is imposed by law." That statement is precise and accurate, except for the internal contradiction which results from the inclusion of the adjective "contractual". The difference between a legal duty to perform in accordance with a bargain and an obligation imposed in invitum to avoid injury to another is the fundamental distinction between contract and tort. Therefore, we adopt a legal fiction if we say that the wrong proved in this case is a breach of contract. Moreover, on the present record, to invoke the ancient common law procedural device of waiving the tort and suing in "assumpsit" is merely to formalize and Latinize the fiction without substantiating it. In reality, the wrong here is a tort and nothing else.
 
 
 91
 Indeed, this court has already held in another case growing out of the same accident that the catastrophic crashing of the appellant's aircraft in navigable water within a marine league of the Massachusetts shore was a maritime tort within the admiralty jurisdiction of the United States and its courts. Weinstein v. Eastern Airlines, Inc., 3d Cir. 1963, 316 F.2d 758.[1] The majority undertakes to counter this holding by arguing on the authority of Griffith v. United Air Lines, Inc., 1964, 416 Pa. 1, 203 A.2d 796, that Pennsylvania law would recognize and act upon an alternative view of this case a substantiated claim for breach of contract. This is at least very doubtful, if only because, as we already have pointed out, no contract is in evidence here. But more fundamentally, when, in the course of litigation in a federal court, it becomes necessary to determine whether the wrong in suit is a maritime tort or a breach of contract, the federal court must decide for itself what characterization is proper, without any duty of deference to any state view. And when it appears that the wrong in suit has the essential character of imposed liability for negligent personal injury and can be analyzed as a breach of a promise only by invoking a legal fiction, the alleged state view is no more persuasive than it is authoritative.
 
 
 92
 This conclusion has been reached without any differentiation between the survival claim and the wrongful death claim. But even if the survival claim could be characterized as a contract claim of the decedent to which his kin succeeded upon his death, the wrongful death claim will not bear any such restructuring.[2]
 
 
 93
 Admittedly, the wrongful death claim is an original claim of someone other than the decedent for negligent invasion of the claimant's own economic interests. The carrier had no contract with this claimant and made no promise to the passenger to do anything for his dependents. The majority opinion suggests no way, and we can think of none, in which this claim can logically be treated as contractual. Cf. Miller v. Preitz, 1966, 422 Pa. 383, 221 A.2d 320; DiBelardino v. Lemmon Pharmacal Co., 1965, 416 Pa. 580, 208 A.2d 283.
 
 
 94
 But even without characterizing this suit as contractual, the majority would allow recovery measured by the wrongful death and survival statutes of Pennsylvania. Reasons for rejecting that conclusion are stated in the opinion of the panel which first heard this appeal. Analysis begins with the conception that the applicable rules of maritime law are part of a controlling body of national law with state law as such playing no authoritative role. Though diversity of citizenship is alleged and established in this case, the rules of Erie R. R. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 and Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, have no proper application. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.[3] However, in fashioning admiralty remedies for wrongful death in waters adjacent to a state, the federal courts uniformly have seen fit to create an admiralty remedy equivalent to the statutory wrongful death remedy of the state within whose territorial waters the wrong occurred. The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524.
 
 
 95
 Admiralty might have employed some other device, for example, allowing recovery equivalent to that provided by the Death on the High Seas Act. 46 U.S.C. §§ 761-767. Or the less generous death benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 909, could have been used as a model. Indeed, courts of admiralty, adhering to historic maritime precept, might have refused to allow any death recovery until Congress should so legislate. Or admiralty might inquire in each case what state has the most impressive contact, or aggregate of contacts, with the parties and transactions involved in the fatal accident and borrow the remedy of that state for wrongful death.
 
 
 96
 This last alternative, which the majority now adopts, would introduce new variables and new elements of uncertainty into the determination of admiralty awards for wrongful death. It also would invite forum shopping and lead to litigated controversy, such as this disaster already has produced, over the removal of causes. It is difficult to believe that the result of this change would be an improvement upon the present practice of consistently borrowing the remedy of the place of wrong, one state that always is substantially concerned with and historically has provided a remedy for fatal accidents occurring within its borders.
 
 
 97
 It is noteworthy in this connection that even the majority opinion speaks of federal concern to respect "the sovereignty of the states over deaths caused by maritime torts within state territorial waters." State "sovereignty" seems an overstatement of what undoubtedly is legitimate state concern in such a situation as this since paramount authority in the maritime realm is national rather than state. But the majority is correct that recognition of the special interest of a state in harm suffered within its geographic boundaries is implicit in the federal borrowing of wrongful death remedies of that state. In this case the logical result of the point made by the majority would be to allow a maritime wrongful death recovery equivalent to that provided by the law of Massachusetts.
 
 
 98
 Conceding that in no reported case involving death in territorial waters has the Supreme Court sanctioned an admiralty borrowing of the wrongful death act of any state other than that within whose territorial waters the fatal accident occurred, the majority finds analogical justification for a different procedure here in Lauritzen v. Larsen, 1953, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 and Romero v. International Terminal Operating Co., 1959, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368. But both of these cases posed the question whether the maritime law of one nation or of another nation should be recognized as determinative of liability for a particular maritime injury. Here, in contrast, the only maritime law involved is our own federal law, and its authority in the present context is unchallenged. Moreover, in the Lauritzen case the dominant considerations were that the ship flew the Danish flag and the injured seaman and the defendant shipowner were Danish nationals. It is of no relevance in our case that in the adjudication of maritime tort claims the national law of the place of injury may be subordinated to the national law of the flag and of the parties' allegiance. On the other hand, it is particularly striking that in Lauritzen short shrift was accorded the argument that the law of the United States should apply because the plaintiff seaman had been hired in the United States. The Court said: "We do not think the place of contract is a substantial influence in the choice between competing laws to govern a maritime tort." 345 U.S. at 589, 73 S.Ct. at 932. If anything in Lauritzen is helpful in our case, it is that language.
 
 
 99
 The Romero case refused to apply a statute of the United States, the Jones Act, to a maritime tort involving Spanish parties on a Spanish ship in New York harbor. There too the dominance of flag and nationality determined the choice between the maritime laws of different nations. This decision has no relevance here where our accepted starting point is the dominance of federal law over local law in the maritime area.
 
 
 100
 Finally, we have not overlooked the argument, not considered by the majority, that admiralty should fashion the details of its own wrongful death remedy without regard to any special limiting provisions of the wrongful death statute of any concerned state. To us this would make sense. It also would make for desirable uniformity in maritime law. But unless and until the Supreme Court shall adopt this position, as unsuccessfully urged by the four dissenting Justices in The Tungus v. Skovgaard, supra, we think an inferior federal court is obligated to allow and define recovery here in the manner indicated by the wrongful death law of Massachusetts.[4]
 
 
 101
 For the reason stated in this opinion and in the opinion of this court on first hearing of this appeal, we who dissent would reverse the judgment of the district court and order a new trial on the issue of damages.
 
 
 
 Notes:
 
 
 [1]
 TheWeinstein opinion recognized the possibility that a breach of warranty or other contractual undertaking could also be involved. But Weinstein did not reach the present question whether the wrong actually established at trial was a tort or a breach of contract.
 
 
 [2]
 TheGriffith case upon which the majority relies was an action on a survival claim, not a wrongful death claim.
 
 
 [3]
 Even where suit is brought in a state court for maritime injury caused by a shoreside negligent act, the state court must apply national maritime law. Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927
 
 
 [4]
 Footnote 9 of the majority opinion suggests that the Massachusetts limitations on recovery for wrongful death may be "so offensive to traditional principles of maritime law that admiralty should decline to enforce" them. Of course admiralty traditionally allowed no recovery for wrongful death. Thus, recovery as limited by Massachusetts would be a liberalization of the historic principles of admiralty law