Louis F. CAVIC and Helen A. Cavic, his wife, Plaintiffs-Appellees, Cross-Appellants,

v.

The GRAND BAHAMA DEVELOPMENT COMPANY, LIMITED, Defendant-Appellant, Cross-Appellee.

No. 81–5649.

United States Court of Appeals, Eleventh Circuit.

March 28, 1983.

Roger C. Minahan, Minahan & Peterson, Milwaukee, Wis., for defendant-appellant, cross-appellee.

J. Richard McEachern, Guilfoil, Symington, Petzall & Shoemake, St. Louis, Mo., for plaintiffs-appellees, cross-appellants.

Before FAY and CLARK, Circuit Judges, and MARKEY *, Chief Judge.

FAY, Circuit Judge:

This is an appeal from the final judgment for $440,000.00 entered by the district court upon a jury verdict rendered in favor of the

* Honorable Howard T. Markey, Chief Judge for the Federal Circuit, sitting by designation.

appellees. The appellees sued the appellant for common law fraud alleging that they were induced by fraudulent misrepresentations to enter into contracts to purchase from the appellant real property located in Freeport, Grand Bahama Island. A jury found for the appellees on their common law fraud claim and awarded both compensatory and punitive damages. We affirm the award in its entirety.

## FACTS

Throughout the course of this litigation the appellees have maintained that they are victims of a sophisticated, complicated, and fraudulent land-sale scheme operated by the appellant. While much of the evidence adduced at trial was conflicting and hotly contested, the following facts are basically undisputed:

The appellant is engaged in the business of developing the tourist-related industry and land subdivisions for resale in Freeport, Bahama.

In September of 1968 the appellees travelled to Freeport for a vacation. On September 23, 1968, the appellees signed two contracts for the purchase of two parcels of real property from the appellant for $26,361.00 and $48,965.00. The contracts required the appellees to make a total down payment of $15,066.00, with sixty monthly installments of $311.00 and $574.00.

The appellees executed two contracts for the purchase of two additional parcels of real estate in Freeport on November 23, 1968. These contracts were for property with respective prices of $51,715.00 and $46,105.00. The contracts required the appellees to make a total down payment of $19,564.00, with sixty monthly installments of $543.00 and $609.00.

The appellees were unable to keep up the monthly payments on the four lots; consequently, they eventually defaulted on the 1968 contracts. Concerned about their investment, one of the appellees returned to the Bahamas to meet with the appellant. As a result of this meeting, on May 17, 1972, the appellees executed four release authorizations whereby the principal payments made on the 1968 contracts, together with appreciation allowed by the appellant, were applied to the purchase of two pieces of ocean-front property in Freeport. Although no cash down payment was required for these purchases, the appellees were obligated to pay the $154,332.00 principal balance by 120 monthly installments of $1,312.89 and $479.14. The appellees received no money from this transaction, even though the transaction was considered a "trade up" and appreciation was shown in the value of the original four pieces of property purchased by the appellees.

It was later proposed that the appellees transfer their equity and appreciation in the two pieces of oceanfront property into a venture to build an oceanfront hotel in Freeport, since the greater marketability and resale value of the hotel would enhance the appellees' chances of recovering their equity. Accordingly, on March 23, 1973, the appellees executed an agreement with Gateway Investments, Ltd. ("Gateway") in which they agreed to establish a joint venture between themselves and others for the purpose of purchasing beachfront property in Freeport and constructing a 400 room hotel. The venture took the form of Clubhotels (Bahamas) Ltd. ("Clubhotels"). Gateway, as trustee for Clubhotels, contracted with the appellant on April 6, 1973 for the sale of the land upon which the hotel was to be built. The appellees agreed to contribute their equity in the two pieces of oceanfront property to Clubhotels, to be used in making partial payment of the price due under Clubhotels' contract with the appellant for the purchase of the hotel property and the development of the hotel. The appellees assigned their equity directly to the appellant. In return for their contribution to the joint venture, the appellees were to receive shares of Clubhotels' stocks in the amount of their contribution. Because the equities that were traded in by the members of the venture far exceeded the purchase price of the land upon which the hotel was to be constructed, the excess equities were traded in for another piece of oceanfront property, which the venturers were to

hold free and clear without any building compulsion requirement.

Clubhotels continually suffered from an inability to secure financing and necessary permits and licenses, until the time that the appellant declared Clubhotels' contract with it to be in default in September, 1977. All of the paid in equity, as well as the land, was forfeited to the appellant. This included the land which Clubhotels was to receive "free and clear." These two tracts of land subsequently were resold by the appellant.

On December 30, 1976, the appellees filed a complaint against the appellant in the Circuit Court of Dade County, Florida, seeking compensatory and punitive damages for alleged common law fraud and unjust enrichment. The action was removed to the United States District Court for the Southern District of Florida on January 31, 1977.

The appellees attempted to serve the appellant with process on three occasions. Suit papers were finally served on Charles Schuette, the resident agent of American Division, Inc., and the Florida Secretary of State. The appellant's motions to quash service of process and dismiss for lack of *in personam jurisdiction* were denied on February 17, 1978.

The cause was tried before a jury on April 13–16, 1981. At the close of the appellees' case-in-chief, the trial judge denied the appellant's motion for a directed verdict. At the close of all the evidence, the trial judge granted the appellant a directed verdict on the unjust enrichment claim and only submitted the common law fraud claim to the jury for determination. The jury returned its verdict and awarded the appellees $140,000.00 in compensatory damages and $300,000.00 in punitive damages. The appellant's post-trial motions for directed verdict, judgment notwithstanding the verdict, or for new trial were denied on June 1, 1981. Timely appeal was filed by the appellant on June 23, 1981. The appellees filed a cross-appeal only as to the denial of prejudgment interest.

## DISCUSSION

### I. Applicable Law.

Before discussing the points of error raised on appeal by the appellant, it is necessary to pause and decide what law governs the appellees' claim for fraud.

■ Fed.R.Civ.P. 44.1(1) requires parties to give written notice, in the pleadings or otherwise, of their intention to assert foreign law. The Restatement (Second) of Conflicts provides:

> [Where] either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law .... The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties .... When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum ....

Restatement (Second) of Conflicts Section 136, comment h, at pp. 378–79 (1971); *see* 5 Moore's Federal Practice p. 44.1.03, p. 1655 (2d ed. 1977). Here, even though the alleged misrepresentations were made in Freeport, none of the parties claimed the applicability of Bahamian law or asserted that it differs from that of Florida. Rather, recognizing that the Bahama Islands and Florida share a common civil law background, each party asserts the similarity in the laws governing claims for fraud in both jurisdictions and seems to have assumed that Florida law governs. "Because the parties did not raise any conflict of laws issue in the district court and do not raise it on appeal, under applicable conflict of laws principles the law of the forum ( [Florida] ) would govern the substantive issues due to the absence of facts justifying the application of the law of some other jurisdiction." *Montgomery Ward & Co., Inc. v. Pacific Indemnity Company,* 557 F.2d 51, 58, n. 11 (3rd Cir.1977); *Clarkson Co. Ltd. v. Shaheen,* 660 F.2d 506, 513, n. 4 (2d Cir.1981); *Commercial Insurance Company of Newark v. Pacific Peru Construction,* 558 F.2d 948, 952 (9th Cir.1977); *Seguros Tepeyac, S.A.,*

*Compania Mexicana v. Bostrom,* 347 F.2d 168, 174, n. 3 (5th Cir.1965) (in the absence of statute, foreign law or rights thereunder to be given effect must be proved like any other fact, in the absence of which the law of the forum is ordinarily applied).

## II. The Sufficiency of the Evidence.

We next confront the appellant's contentions that the trial court erred in denying its motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial. In reviewing these claims, we need to address the appellant's underlying arguments that the evidence was insufficient to support the verdict and judgment.

The yardstick against which the above motions must be measured is a federal one:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence that supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969).[1] "As an appellate court, our sole function is to ascertain whether there is a rational basis in the record for the jury's verdict; we are forbidden to usurp the function of the jury by weighing the conflicting evidence and inferences and then reaching our own conclusion." *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1288 (5th Cir.1974); *Bauman v. Centex Corp.,* 611 F.2d 1115 (5th Cir.1980). After review-

ing the evidence in favor of the appellees, we find that there was sufficient evidence to support the jury's finding that the appellant committed fraud resulting in injury to the appellees.

■ The common law remedy for fraud "imposes upon the plaintiff the burden of demonstrating, *inter alia,* '(1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon....'" *Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996, 1000 (5th Cir.1974), *quoting Poliakoff v. National Emblem Insurance Company,* 249 So.2d 477, 478 (Fla.App., 3d Dist.1971). The most substantial attack made by the appellant deals with the sufficiency of the evidence for one of these elements: the falsity of representations made by the appellant to induce the appellees to invest in real property or to "trade up" in value from land they already owned, and whether such representations related to fact.

■ In general, to constitute actionable fraud, a false representation must relate to an existing or pre-existing fact, *Entron Inc. v. General Cablevision,* 435 F.2d 995, 997 (5th Cir.1970); *Poliakoff v. National Emblem Insurance Co.,* 249 So.2d 477, 478 (Fla.Dist.Ct.App.), *cert. denied,* 254 So.2d 790 (Fla.1971), an unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud. Also, a promise of future action or a prediction of future events cannot, standing alone, be a basis for fraud because it is not a representation, there is no right to rely on it, and it is not false when made. *Plantation Key Developers, Inc. v. Colonial Mortgage Company of Indiana, Inc.,* 589 F.2d 164, 172 (5th Cir.1979); *Cameron v. Outdoor Resorts of America, Inc.,* 608 F.2d 187 (5th Cir.1979); *Brod v. Jernigan,* 188 So.2d 575, 579 (Fla. Dist.Ct.App.1966); W. Prosser, The Law of Torts Section 109, at 726 (4th ed. 1971).

---

1. This circuit has adopted as binding precedent the decisional law of the former fifth circuit that was published before October 1, 1981.

*See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

The evidence adduced at trial reveals that the appellant acting by and through its exclusive real estate agent, Intercontinental Realty, made numerous representations to the appellees about land appreciation, resale factors and recovery of equity.[2] The appellant characterizes any representations made as mere puffing, or statements of opinion and general anticipation necessarily understood by the appellees, hence not even amounting to representations of past or present fact. The appellees, of course, characterize the representations as flat factual assertions about future events, of a sort susceptible to technical prediction by individuals with the kind of special knowledge of the Bahamian real estate market reasonably attributable to the appellant and its real estate agent; they contend that the representations were false and known to be false when made, or made without belief of their truth, and were part of an overall sophisticated, fraudulent land sale scheme operated by the appellant. Obviously, if the evidence supports a finding of an overall fraudulent land-sale scheme, then the numerous representations and promises made by the appellant in order to lull the appellees into participating in the scheme must be viewed in context.

We take care to emphasize that our inquiry on the motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial, is simply whether the evidence was sufficient to permit a jury rationally to find for the appellees on this element of their common law fraud claim. The resulting problems of credibility, probative force and of inferences to be drawn were, of course, for the jury. We conclude that the evidence was sufficient for the jury to find that the appellees were victims of a fraudulent land-sale scheme operated by the appellant, and that the various representations made by the appellant were foreconscious deceptions which amounted to fraudulent misrepresentation.

If believed, the evidence adduced at trial contained indicia of a typical land-sale fraud. The appellant promised the appellees a lucrative return on their initial investment. In a continuing effort to forestall any discovery of the fraud and to further lull the appellees into complacency, the appellant, acting by and through its real estate agent, kept "trading up" the appellees into "better" investments. Throughout these various "trade ups," the appellees made it repeatedly known that their only interest was in securing the return of their equity; they were not concerned with making a profit. Finally, they were told that if they invested in the Clubhotels venture this would be yet another way of realizing their equity. There is no evidence that a hotel was ever built in connection with this last venture. In addition to forfeiting the land

2. The record is replete with representations made by Intercontinental Realty to the appellees in order to induce them to invest in real estate or to "trade up" in value their equities. Representations were made to the appellees that Freeport was experiencing a "tremendous boom," that the movie industry was moving to Freeport and sports people were already converging on the island, and that certain parcels of land were tremendous selections. Various assurances were made that the appellant could resell the appellees' property at a profit, allowing the appellees to recoup their equity if they were unhappy with their initial investment. When the appellees began having trouble making their monthly payments on the four canal lots, the appellees met with Intercontinental Realty in the Bahamas. Again the appellees were assured that their property could be sold at a profit, and later were told that their property was sold to a German Syndicate, investing money in the islands. The appellees' property was not sold. Intercontinental Realty then proposed to the appellees that their four previous real estate contracts be "traded up" into more expensive pieces of oceanfront property, since the oceanfront property could more easily be sold. Relying on these representations, the appellees traded their equities into the two pieces of oceanfront property.

On a later date, Intercontinental Realty proposed that the appellees transfer their equity and appreciation in the two pieces of oceanfront property into a venture to build an oceanfront hotel in Freeport. Again, the real estate agent represented that a "trade up" in investments would make it easier for the appellees to recover their equity. It also represented that by the time the hotel was completed the appellees' equity would be worth three-quarters of a million dollars. Various representations were made to the appellees concerning financing of the hotel project, none of which proved to be true.

upon which the hotel was to be built, Clubhotels also lost the other parcel of land which it was to obtain "free and clear" with no building requirement. Although the "trade ups" were made under the guise that the "better" investments would have greater marketability and resale value, and thus enable the appellees to realize their equity, the true effect of these transactions was to take more money from the appellees. There was no evidence that any of the land that the appellees had an interest in ever appreciated in value or was ever sold, or that a hotel was ever built in connection with the last venture. A German group was supposed to purchase the appellees' original four tracts, as well as the two oceanfront tracts the appellees traded their initial investments for; the German group was also supposed to purchase the oceanfront hotel. None of these properties were ever sold. With regard to Clubhotels, the appellees were assured that financing had been secured and that there would be no problem in obtaining permits. Again, none of this proved to be true. The record is clear that the appellees placed their trust in the appellant and its real estate agent, and in said parties' numerous representations that if they continued to "trade up" their investments they would recover the equity which they put into the land.

■ The jury was justified in determining that these various representations were made with knowledge of their falsity. Also, there can be no argument that these statements were made with the intention of inducing the appellees to act upon the representations, since the whole reason for making the statements was to cause the sale of land or to urge the appellees to trade up in value from land they already owned. It is clear that the appellees acted in reliance on these statements, first to clear a profit and then in an attempt to recover their equity. There were certainly grounds for the jury to decide that such reliance was justifiable: the appellant consistently represented that it was a tremendously successful, reputable company; and, the appellees themselves were inexperienced with regard to the sale of land.

Appellant argues that "sales puffing" cannot be a basis for common law fraud. But appellees' claims go much further. It was the appellees' contention that the "scheme" involved the entire process of original purchase, trade up to more expensive properties, use of "paper appreciation" in value, trade-in to a building venture (hotel construction), default by joint venture (through unavailability of funds and permits, both of which appellees maintained were controlled by appellant), and ultimate forfeiture (total investment). Such a scheme involves much more than puffing or predictions of the future.

The appellant next contends that the evidence failed to establish that Intercontinental Realty was acting on its behalf when the agency solicited the sales of the appellees' properties and sold the appellees' 1968 contracts and related properties.

■ It is undisputed that Intercontinental Realty was the appellant's exclusive real estate agent. "In an action for misrepresentation, a principal is liable for the fraud of his agent while acting in the scope of his authority, and this principle of law is fully applicable to corporations." *Taco Bell of California v. Zappone,* 324 So.2d 121, 123 (Fla.Dist.Ct.App.1975).

■ The appellant concedes that Intercontinental Realty was its "exclusive agent" and yet argues that the agency acted on its own behalf when it solicited the sales of the appellees' properties; the appellant maintains that no evidence was introduced that showed that it specifically authorized Intercontinental Realty to solicit the sale of the appellees' properties. "No such showing, however, is required under Florida law for a principal to be bound by the acts of its agent and an agent's authority need not be conferred in express terms, but may be implied under justifying circumstances." *City National Bank of Detroit v. Basic Food Industries, Inc.,* 520 F.2d 336, 337 (5th Cir.1975), *citing American Ladder & Scaffold Co. v. Miami Ventilated Awning Mfg. Co.,* 161 So.2d 699, 700 (Fla. Dist.Ct.App.1964). "It is enough that the

principal allows or causes others to believe that an agent possess actual authority." *Id.,* citing *Tampa Sand & Material Co. v. Davis,* 125 So.2d 126, 127 (Fla.Dist.Ct.App. 1960). "Even when an agent's act is unauthorized, the principal is liable if the agent had the apparent authority to do the act and that apparent authority was reasonably relied upon by the third party dealing with the agent.... Apparent authority must be the result of acts or omissions by the principal in order to subject the principal to liability for the agent's actions." *Benson v. Seestrom,* 409 So.2d 172, 173 (Fla.Dist.Ct. App.1982); *Taco Bell of California,* 324 So.2d at 123. In the instant case, the parties agree that the issue of the appellant's liability was tried on the theory of apparent authority.

Apparent or ostensible authority arises where a principal allows or causes others to believe the agent possesses such authority, as where the principal knowingly permits the agent to assume such authority or where the principal by his actions or words holds the agent out as possessing it. *Tampa Sand and Material Company v. Davis,* Fla.App.2d 1960, 125 So.2d 126. The doctrine rests on the premises that one who allows another to serve as his agent must bear the loss which results to a third party from the party's dealings in reliance on that agent's supposed authority.

*Taco Bell of California* at 123–124. Here, Intercontinental Realty, the exclusive real estate agent for the appellant, solicited the sale of the appellees' properties and sold the appellees' 1968 contracts and related properties.[3] The appellant now argues that Intercontinental Realty was its exclusive agent only for the purpose of soliciting sales of appellant's real property, and the agency was not authorized to act on its behalf in soliciting the sales of properties belonging to others, including the properties or contracts of persons who purchased property from the appellant. Despite the appellant's attempts to narrowly define Intercontinental Realty's actual authority as soliciting agent for sales of its properties, it is obvious that the agency had the broad apparent authority to handle real estate transactions for the appellant. Intercontinental Realty handled the initial sale of the appellant's property to the appellees in September of 1968. None of the facts or circumstances of this transaction or any of the subsequent real estate transactions put the appellees on notice that Intercontinental Realty's authority as the appellant's exclusive real estate agent was limited to soliciting sales of the appellant's properties. Indeed, the appellant concedes that it did not introduce any contract delineating the agency relationship between itself and Intercontinental Realty, and that it failed to introduce into evidence anything that would have indicated to the appellees that Intercontinental Realty's authority to act on the appellant's behalf was limited to soliciting the sale of the appellant's real estate. Therefore it was reasonable for the appellees to assume that Intercontinental Realty was acting on the appellant's behalf

**3.** The appellant's sale of the first two tracts of land to the appellees in September of 1963 was handled by John Hicks and Tony Rodriguez. These two individuals witnessed the appellees' signatures on the 1968 contracts, which were executed inside the appellant's office. The appellant's business records list both Hicks and Rodriguez as "salesmen," and the appellees as "customers." Rodriguez was undisputably a salesman for Intercontinental Realty. In the appellees' November, 1968 purchase of two additional lots from the appellant, Hick's name appears next to the notation "salesman" on the appellant's copies of the contracts.

Rodriguez, who was specifically represented to the appellees to be one of the appellant's salesmen, took the appellees to see Martin Sinsley, Mr. Waldorf, and Louis Bossert about land resale and payment moratoriums. All were employed by Intercontinental Realty, the appellant's exclusive sales agent. These individuals worked in the same building; Bossert's name appears on the appellant's commission records; and, Sinsley corresponded with the appellees on Intercontinental Realty stationery.

Laszlo Jarmai, a salesman for Intercontinental Realty, was listed as a salesman and the appellees as customers on the appellant's commission records. His name appears on the appellant's copies of the sales contracts the appellees entered into for the two pieces of oceanfront property. Jarmai sent correspondence to the appellees on Intercontinental Realty letterhead.

and within its authority when the agency solicited the sale of their contracts and properties. Moreover, the jury was justified in its finding of Intercontinental Realty's apparent authority. Without further extending this opinion with our analysis of the evidence bearing upon the jury's ultimate finding of apparent authority, we conclude that the record does support such and that on appeal we are not at liberty to disturb it. *City National Bank of Detroit v. Basic Food Industries, Inc.,* 520 F.2d 336, 337 (5th Cir.1975).[4]

After reviewing the record, we find that there was sufficient evidence to permit a jury to find that the appellant committed fraud resulting in the injury to the appellees. The evidence and defenses urged at trial by the appellant were matters for the fact finders. Reasonable jurors could have resolved this dispute for either side. This being so, the trial court was guilty of no error in denying the appellant's motions for a directed verdict and judgment n.o.v. Similarly, given the conflicting evidence and the hotly contested inferences drawn therefrom, denial of the defendant's motion for a new trial was not an abuse of discretion. *Bauman v. Centex Corp.,* 611 F.2d 1115, 1119 (5th Cir.1980); *Davis v. Yellow Cab Co.,* 220 F.2d 790, 791 (5th Cir.1955).

## III. Jurisdiction

The appellant argues that the district court erred in dismissing its motion to quash service of process and to dismiss for lack of *in personam jurisdiction.* After an extensive hearing on the motion, and after considering numerous memoranda of law submitted by the parties, together with a multitude of exhibits and depositions taken for purposes of the motion, the trial judge entered an order denying the appellant's motion to dismiss or quash on the ground that valid service had been effected under Fla.Stat. Section 48.081. We find no error in the trial judge's ruling.

Fla.Stat. Section 48.081(2) provides that if a foreign corporation has none of the officers or agents specified in Section 48.-081(1) in Florida, service may be made on any agent transacting business for it in the state of Florida.[5]

After a review of the services performed by American Division, Inc. on behalf of the appellant as reflected by the record on appeal, it is apparent that the American Division, Inc. was the appellant's agent for transacting its business in the state. The

---

4. The fact of agency, and the boundaries of an agent's authority are determinable as questions of fact by the jury, *Hudak v. Economic Research Analysis, Inc.,* 499 F.2d 996, (5th Cir. 1964), as is the issue of apparent authority. *United Bonding Ins. Co. v. Banco-Suizo-Panameno, S.A.,* 422 F.2d 1142 (5th Cir.1970); *T.G. Bush Grocery Co. v. Conely,* 55 So. 867 (Fla. 1911). Further, whether an agent's acts are within the scope of his apparent authority, and whether the acts were ratified by the principal, are questions of fact, and findings will not be set aside unless clearly erroneous. *Boque Electric Manufacturing Co. v. Coconut Grove Bank,* 269 F.2d 1 (5th Cir.1959); *One Hour Valet of America, Inc. v. Keck,* 157 So.2d 83 (Fla.App. 1963).

5. Section 48.081 provides:

(1) Process against any private corporation, domestic or foreign, may be served:

(a) On the president or vice-president, or other head of the corporation; and in his absence:

(b) On the cashier, treasurer, secretary or general manager; and in the absence of all of the above:

(c) On any director; and in the absence of all of the above:

(d) On any officer or business agent residing in the state.

(2) If a foreign corporation has none of the foregoing officers or agents in this state, service may be made on any agent transacting business for it in this state.

(3) As an alternative to all of the foregoing, process may be served on the agent designated by the corporation under Section 48.091.

(4) This section does not apply to service of process on insurance companies.

(5) Where a corporation has a business office within the state and is actually engaged in the transaction of business therefrom, service upon any officer or business agent, resident in the state, may personally be made, pursuant to this section, and it is not necessary in such case, that the action, suit or proceeding against the corporation shall have arisen out of any transaction or operation connected with or incidental to the business being transaction within the state.

appellant argues, however, that the appellees' cause of action did not arise out of its business activities in the state of Florida, and that there was no proof that it was transacting business in the state at the time the cause of action accrued. This argument is refuted by the evidence of record which shows that many of the funds of which the appellees were defrauded were sent to the appellant's post office box in Florida and deposited in a Miami bank. The appellees also corresponded with the appellant regarding their accounts through locations in Florida. Further, we agree with the contention of the appellees that their cause of action did not accrue on January 1, 1970, but that it arose out of a continuous course of conduct culminating in the hotel transactions (terminated in 1977). The evidence of record clearly shows that the appellant was engaged in substantial business activities in Florida during that period.

We find that there was substantial evidence to support the determination of the trial judge that the appellant transacted business in the state of Florida and that American Division, Inc. was the appellant's business agent for transacting its business in the state. *Crown Colony Club Ltd. v. Honecker,* 307 So.2d 889 (Fla.App. 1974). Thus, service of process upon Charles A. Schuette, the resident agent of American Division, Inc., which at all times material was the appellant's agent for transacting business in the state of Florida, was properly perfected under Fla.Stat. Section 48.081.[6]

IV. Prejudgment Interest

On cross appeal, the appellees argue that the trial judge erred by failing to allow the jury to consider prejudgment interest. With respect to entitlement to prejudgment interest, "Florida follows the traditional rule of allowing prejudgment interest where a claim is liquidated, but not where a claim is unliquidated." *Town of Longboat Key v. Carl E. Widell & Son,* 362 So.2d 719, 723 (Fla. 2d DCA 1978). "[A] claim is unliquidated when the amount of damages cannot be computed except on conflicting evidence, inferences and interpretations." *Cioffe v. Morris,* 676 F.2d 539, 543 (11th Cir.1982) quoting *Town of Longboat Key* at 723. In the instant case, not only was the right to recovery contested but there was a genuine dispute between the litigants as to the amount of the appellees' respective damages. This dispute was not resolved until the jury rendered its final judgment. The record makes it clear that the amount of the appellees' damages was uncertain and a matter of genuine dispute. Consequently, there was no error in the trial judge's refusal to submit the question of prejudgment interest to the jury. *Parkers Mechanical Con. v. Eastpoint Water,* 367 So.2d 665 (Fla.App.1979); *see Bryan and Sons Corp. v. Klefstad,* 265 So.2d 382 (Fla. 4 DCA 1972).

We have examined thoroughly all of the appellant's contentions raised on appeal, including those not worthy of discussion, and find them to be without merit. The judgment is affirmed.

AFFIRMED.

---

**6.** The appellant also argues that the appellees' claims were barred by the statute of limitations. As grounds for this assertion, the appellant claims that the misrepresentations should have been discovered earlier than six years prior to the filing of the lawsuit in December of 1976. Whether fraud should have been discovered earlier is generally considered to be a question of fact. *Upledger v. Vilanor, Inc.,* 369 So.2d 427, 430 (Fla.App.1979). This is particularly true where the conduct of the alleged fraudulent party was calculated to mislead, deceive, or dissuade inquiry from the victim. *Norris v. Hoggin,* 136 U.S. 386, 10 S.Ct. 942, 34 L.Ed. 424 (1890). Contrary to the appellant's assertions, the jury found that the appellees did not discover nor should have reasonably discovered the fraudulent misrepresentations that underlie this litigation prior to December 30, 1970. The record shows ample support for this finding by the jury.