MIKVA, Chief Judge,
dissenting from Part 11(C):
I do not share my colleagues’ conclusion that the Warsaw Convention bars recovery of punitive damages. Instead, I would remand with instructions that the district court engage in a proper choice of law analysis.
A. Warsaw Convention
The Warsaw Convention, officially denominated the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, was adhered to by the United States in 1934. See 49 Stat. 3000, T.S. No. 876 (1934), reprinted in 49 U.S.C.App. § 1502, note. The Convention was negotiated with hopes of facilitating the growth of the in *1487 fant airline industry, and the drafters sought to create a scheme that would presume carrier liability for air disasters but cap monetary liability at a very low level. Article 17 provides that “[t]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger....” As the majority explains, this liability appears to cover only compensatory damages. Article 22 originally capped monetary damages at approximately $8,300 per passenger. That figure was raised to $75,000 by the 1966 Montreal Agreement for flights to and from the United States (undermining the goal of uniformity for the sake of preventing denunciation by the United States government).
Two other provisions of the Convention are of particular relevance in the instant appeal. Article 24 leaves procedural questions to local law provided that “any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.” This language contemplates the availability of causes of action that are separate from Article 17, though governed by the limitations of the Convention. Finally, Article 25 provides that “[t]he carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his willful mis-conduct_” The dispute before us re-
quires that we carefully sort out the interplay of these various sections.
The majority holds that the Warsaw Convention was intended to provide compensatory relief only, and that therefore punitive damages are not available even in causes of action not based on Article 17. Nowhere are punitive damages explicitly prohibited. In this country, “legislative silence with respect to punitive damages do[es] not preclude such a recovery.” Racich v. Celotex Corp,, 887 F.2d 393, 396 (2d Cir.1989); see Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984). Even so, I am persuaded by the majority’s conclusion that Article 17 cannot be read to authorize the recovery of punitive damages for claims based on the Convention. If any of the plaintiffs in these cases premised their complaints solely on a Warsaw Convention cause of action, I would concur in holding that they were not entitled to recover punitive damages. But few if any of the complaints were so limited in pleading only the Convention as a cause of action.
The plaintiffs in these cases brought their damages claims against KAL under a potpourri of legal theories including the Warsaw Convention. In denying KAL’s motion to strike plaintiffs’ jury demand, the district court untangled the sources underlying each of the plaintiff’s complaints and found that most alleged a combination of state and federal claims (both common law and statutory) along with claims based on the Convention. See In re Korean Air Lines Disaster of September 1, 1983, 704 F.Supp. 1135, 1151-55 (D.D.C.1988). Almost all of the complaints alleged something other than merely the Convention as a basis for recovery and several failed to plead the applicability of the Convention at all. See id. at 1151 n. 40, 1154— 55. The district court correctly emphasized that, whatever the cause of action, the claims were all subject to the limitations contained in the Convention.
The majority decides that complaints sounding in other causes of action such as federal maritime law are also not entitled to punitive damage awards. I find this step in the court’s logic somewhat difficult to fathom. There appear to be two basic rationales underlying such a conclusion: (1) the Convention provides the exclusive cause of action (thereby entirely preempting other possible causes of action that might separately allow punitive damages), or (2) Article 17 creates an implicit limitation on liability governing recoveries premised on separate causes of action (a.k.a. partial preemption). The majority appears to employ the latter rationale, but then dismisses the force of Article 25 in part on the strength of decisions premised on the exclusivity rationale. I think neither one is persuasive and therefore respectfully dissent.
1. Exclusivity
The majority correctly eschews reliance on the first approach, choosing “not [to] *1488 take sides in the exclusivity debate.” Op. at 1488. The Convention is not the exclusive remedy for passengers injured on international flights; in fact, Article 24’s reference to “any action for damages, however founded” clearly contemplates actions arising under separate sources of law but places some limits on recovery. Courts and commentators have rejected suggestions that the Convention provides the exclusive cause of action for international air disasters. See, e.g., In re Air Crash in Bali, Indonesia, 684 F.2d 1301, 1311 n. 8 (9th Cir.1982) (“[T]he Convention has never been read to limit plaintiffs to a cause of action arising thereunder, but rather to limit the recovery in suits for injury.”); Tokio Marine & Fire Insur. Co. v. McDonnell Douglas Corp., 617 F.2d 936, 942 (2d Cir.1980) (“[T]he Convention draftsmen ... did not intend that cause of action to be exclusive.”); Calkins, The Cause of Action under the Warsaw Convention, 26 J. Air L. & Com. 323, 327-28 (1959).
The Second Circuit just recently decided that the Warsaw Convention prohibits the recovery of punitive damages. See In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988, 928 F.2d 1267 (2d Cir.1991). The court took exclusivity as its working premise, see id. at 1273-75, 1282-83, somewhat astonishing in light of the Second Circuit’s own precedents. For a long time, that court had held that no cause of action is established by the Convention. See Benjamins v. British European Airways, 572 F.2d 913, 919 (2d Cir.1978) (finally overruling proposition that had been accepted for twenty years), cert. denied, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). In subsequent decisions, the court ruled that this cause of action was not exclusive. See Tokio Marine, 617 F.2d at 942. Now, by dismissing the statement in Tokio Marine as mere dicta, the Second Circuit has gone full circle from believing that the Convention provides no cause of action to deciding that it provides the sole cause of action for plaintiffs.
Apart from its apparent failure to abide by circuit precedent, the Lockerbie court’s support for the exclusivity holding is hardly overwhelming. For instance, the court emphasized (at 1274) that other countries have held that the Convention is the exclusive cause of action. These were not interpretations of the Convention, however: the common law countries cited in the opinion all had to enact national legislation making Article 17 the exclusive cause of action. The United States has, of course, never done so. Moreover, its description of decisions from other circuits is also somewhat perplexing. For instance, in one case the Ninth Circuit observed that “the delegates did not intend that the cause of action created by the Convention to be exclusive.” In re Mexico City Aircrash of Oct. 31, 1979, 708 F.2d 400, 414 n. 25 (9th Cir.1983). Yet the Lockerbie court asserts that the decision “rebutted the idea that a cause of action may be founded on some law other than the Convention.” 928 F.2d at 1273-74.
In fact, the Ninth Circuit has concluded on more than one occasion that the cause of action is not exclusive. See, e.g., In re Air Crash in Bali, Indonesia, 684 F.2d at 1311 n. 8. All told, the decisions from other circuits appear to be evenly divided on the issue, notwithstanding the court’s claim in Lockerbie, at 1282-83 that the weight of authority is fairly one-sided. See Floyd v. Eastern Airlines, Inc., 872 F.2d 1462, 1482 n. 33 (11th Cir.1989) (collecting cases), rev’d on other grounds, — U.S. -, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). See also Alvarez v. Aerovias Nacionales de Colombia S.A., 756 F.Supp. 550 (S.D.Fla.1991) (distinguishing exclusive remedy of the Convention from the suggestion that it also provides the exclusive cause of action). The Supreme Court has twice now declined to address the exclusivity question. See Eastern Airlines, Inc. v. Floyd, — U.S. at -, 111 S.Ct. at 1502; Air France v. Saks, 470 U.S. 392, 408, 105 S.Ct. 1338, 1346-47, 84 L.Ed.2d 289 (1985). The fundamental error of the Lockerbie court’s decision is the premise that the cause of action provided by the Warsaw Convention is exclusive, and my colleagues are wise not to enter this fray unnecessarily-
*1489 2. Implicit Limitation in Article 17
If the court does not premise its holding on an exclusivity rationale, it must mean that Article 17 acts as a limitation on the liability that an air carrier would face when sued under separate causes of action. But then Article 25 would come into play and waive any such limitation in cases of willful misconduct: “The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct_” Art. 25(1). The majority relies heavily on Lockerbie for the proposition that Article 25 does not trump Article. 17, but there the court had taken exclusivity as its starting point. It is one thing to say that the Convention prohibits punitive damages because it is the sole available cause of action and does not provide for them; it is quite another to conclude that Article 17 acts as a limitation on damages restricting recovery under other causes of action that allow punitive damages.
The Eleventh Circuit has also decided not to take sides in the debate over exclusivity. In resolving the punitive damages question in Floyd, the court first decided that the Convention is not itself a basis for seeking punitive damages. The court concluded that Article 17 was entirely compensatory in tone and rejected plaintiffs’ argument that Article 25’s reference to willful misconduct implied an exception. See 872 F.2d at 1483-85. Next the court rejected the plaintiffs’ effort to seek punitive damages under state common law, holding that state law was preempted to the extent that it was inconsistent with the compensatory scheme of Article 17. See id. at 1485-87.
Preemption analysis will not work in this case, however, because we are confronted with two legal schemes that stand in rough equipoise under the Supremacy Clause: the Warsaw Convention and federal maritime law. See In re Air Crash Disaster Near New Orleans, 821 F.2d 1147, 1161 n. 19 (5th Cir.1987) (“As a ratified treaty of the United States the Warsaw Convention is equal in stature and force as any other domestic federal law.”); Committee of U.S. Citizens in Nicaragua v. Reagan, 859 F.2d 929, 936-37 (D.C.Cir.1988). The Convention cannot, therefore, preempt federal law to the extent of any inconsistency with its compensatory tone; Article 17 can only prevent recovery of punitive damages otherwise available under federal maritime law if it is construed as a limit or condition governing damages under Article 24, but then it becomes subject to waiver in cases where Article 25 applies.
The court in Floyd also relied on subsequent proposals which would have amended Article 25 so that it would only trump the monetary cap in Article 22. See 872 F.2d at 1483-84 (discussing the Hague and Montreal Protocols). But the original language of Article 25 does not suggest that only Article 22 was covered, and the United States never ratified these amendments. See id. at 1468-69. Moreover, the United States responded to the proposed changes by threatening to denounce the entire Convention unless the monetary limits were raised substantially. See Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497, 509-16, 532-46 (1967). In Floyd, the Eleventh Circuit candidly admitted that this country never ratified the Protocols, but found “their clarification of the operation of Article 25 to be instructive.” 872 F.2d at 1484 n. 35. This reasoning is difficult to square with the Supreme Court’s recent instruction that “where the text is clear ... we have no power to insert an amendment.” Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134, 109 S.Ct. 1676, 1683, 104 L.Ed.2d 113 (1989) (“We must thus be governed by the text — solemnly adopted by the governments of many separate nations—whatever conclusions might be drawn from the intricate drafting history_”).
Indeed, in reversing the decision that compensatory damages for purely mental injuries were available under Article 17, the Supreme Court criticized the lower court’s interpretation of subsequent drafting history surrounding the Protocols. See Eastern Airlines, Inc. v. Floyd, — U.S. at - -, 111 S.Ct. at 1498-1502. To the extent that the 1955 negotiating history cited by the Eleventh Circuit in Floyd reflects the *1490 Hague drafters’ understandings about what their predecessors may have had in mind a generation earlier, it is entitled to only marginal weight. See McKelvey v. Turnage, 792 F.2d 194, 200 (D.C.Cir.1986) (“As the Supreme Court and this court have repeatedly remarked, the views of later Congresses as to the meaning of enactments by their predecessors are of little, if any, significance.”), aff'd, 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988).
At best, the subsequent proposals and accompanying drafting history demonstrate only that the original text was ambiguous. At worst, the proposals imply that the negotiators wanted to adjust the bargain that had been struck originally. Indeed, the amended version of Article 25 proposed in the unratified Hague Protocol would not have simply clarified an existing understanding of Article 25 but represented a revised quid pro quo: in exchange for a higher ceiling on damages, carriers sought to narrow the waiver of limitations in cases of willful misconduct. See Lowenfeld & Mendelsohn, at 503-06. See also Comment, Role of Choice of Law in Determining Damages for International Aviation Accidents, 51 J. Air L. & Com. 953, 989 (1986) (discussing Guatemala Protocol which would have eliminated Article 25 altogether in exchange for a higher monetary cap of $100,000). Thus, the history as well as the language of Article 25 supports the conclusion that punitive damages are not prohibited by the Warsaw Convention in cases of willful misconduct even if a cause of action based solely on the Convention would not authorize such damages.
The majority concludes that allowing punitive damage windfalls would contravene the Convention’s primary purpose and understanding of the contracting parties that the treaty was intended to limit the liability of air carriers. The scheme of the Convention closely resembles workmen’s compensation statutes which allow workers to recover prescribed compensatory damages for accidental job-related injuries. These laws reflect a quid pro quo between employees, who are relieved of the burden of proof, and employers, who benefit from the cap on damages. See 2A A. Larsen, Workmen’s Compensation Law § 65.11 (1990), at 12-9. Similarly, the Warsaw Convention balances strict carrier liability for injuries sustained by passengers (Articles 17 and 20) against a cap on monetary damages (Article 22). See Block v. Compagnie Nationale Air France, 386 F.2d 323, 327 (5th Cir.1967), cert. denied, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).
However, workmen’s compensation laws do not limit the availability of separate damage actions in cases of intentional misconduct by the employer. See, e.g., Pratt v. National Distillers & Chem. Corp., 853 F.2d 1329, 1336-39 (6th Cir.1988) (punitive damages are available for intentional injuries), cert. denied, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989); Larsen §§ 68.00-.14. Similarly, the narrow exception in Article 25 of the Convention does not undermine the basic purpose of limiting carrier liability; it simply recognizes that in cases of serious misconduct carriers should not enjoy the benefits of these limitations. Imagine that a carrier decided to deliberately sabotage one of its own flights in hopes of receiving a large insurance settlement on the aircraft. If such egregious conduct went undetected, a financially strapped airline could invest a paltry amount in anticipated payments to decedents’ estates (on a typical flight of the Concorde, for instance, that might create maximum liabilities of $500,000 to the passengers) in exchange for a multi-million dollar insurance pay-off. Even if such unthinkable conduct came to light, the maximum compensatory judgment to the plaintiffs might still be less than the potential insurance recovery discounted by the risk that the fraud might be discovered. The majority’s decision would completely foreclose the availability of punitive damages even in such an egregious case. While the facts of the present case are not as stark as those hypothesized, the point remains the same: if plaintiffs can demonstrate willful misconduct, the limitations of the Convention (and the goals that those limitations serve) should have no application.
*1491 B. Choice of Law
KAL’s pre-trial motion to dismiss plaintiffs’ punitive damage claims was premised exclusively on its argument that the Warsaw Convention precluded such an award. Near the end of the trial, the district court denied KAL’s motion from the bench. Apparently for the first time in the proceedings, KAL’s counsel then requested a choice of law analysis, but in a very vague and non-committal way.
The Court: What law should I pick?
Mr. Barry: I don’t know.
The Court: Where is this case being tried on the issue of liability?
Mr. Barry: Here in the District of Columbia.
The Court: With respect to damages, this aspect of damages which would ordinarily tail along will be a part of an action on liability and damages, except for the construct of the treaty; I mean, what law would apply?
Mr. Barry: Well, Your Honor, I think you have to do a choice of law analysis, just as Judge Green did in the Air Florida litigation here on this very same issue, and she held that laws of differing jurisdictions were going to apply to different issues_ I don’t know the answer to the question.... I raise only a problem. I wasn’t anticipating this, to tell you the truth.
The decision alluded to by KAL counsel was In re Air Crash Disaster at Washington, D.C. on January 13, 1982, 559 F.Supp. 333 (D.D.C.1983) (hereinafter “In re Air Florida Crash ”). The district court’s questions reflect a couple of assumptions: that forum law would automatically govern liability issues and that damages would presumptively be governed by the same jurisdiction’s laws. Both premises are questionable: choice of law principles followed by the District of Columbia courts seek to apply the substantive law of the jurisdiction with the closest connection to and greatest interest in a claim, see Hercules & Co. v. Shama Restaurant Corp., 566 A.2d 31, 40-41 (D.C.App.1989), and separate choice of law analysis of different substantive issues (called “depe-cage”) is now routine. See id.; In re Air Florida Crash, 559 F.Supp. at 341.
The threshold question is whether the choice of law basis for KAL’s motion to dismiss the punitive damages claims was raised too late. Unlike jurisdictional issues, courts need not address choice of law questions sua sponte. It is not clear whether the District of Columbia would follow a default rule that presumes local law controls unless choice of law objections are raised in a timely manner, but that seems to be the norm. See Cavic v. Grand Bahama Devel. Co., 701 F.2d 879, 882-83 (11th Cir.1983); Kramer, Interest Analysis and the Presumption of Forum Law, 56 U.Chi.L.Rev. 1301 (1989). Although “[t]he choice of law question regarding punitive damages should be resolved as soon as possible,” In re Air Crash Disaster at Sioux City, Iowa, on July 19, 1989, 734 F.Supp. 1425, 1429 (N.D.Ill.1990) (hereinafter “In re Iowa Crash”), Rule 12(h)(2), Fed.R.Civ.P., provides that “[a] defense for failure to state a claim upon which relief can be granted ... may be made ... [as late as] the trial on the merits.” If the short verbal exchange cited above was enough to place the issue before the judge, then the district court should have engaged in a choice of law analysis or at least asked for supplemental briefing at that point. See Smith v. Atlas Off-Shore Boat Service, Inc., 653 F.2d 1057, 1059-60 n. 1 (5th Cir.1981) (failure to state a claim could be pressed on appeal where defendant had “sufficiently alerted” the court of the defense during trial). KAL preserved the argument, though just barely. Cf. In re Air Florida Crash, 559 F.Supp. at 336-37 (rejecting contention that Air Florida “waived” its right to present a choice of law argument for the first time on reconsideration of the district court’s ruling, noting that its “interest in the question arose only when this Court ruled that divergent punitive damages laws would govern these parties’ liability”).
The next question is whether KAL properly pled that Korean law was applicable. Rule 44.1, Fed.R.Civ.P., does not require that a choice of law argument based on *1492 foreign law appear in the pleadings. Instead, as the Advisory Committee explained, “[t]he new rule does not attempt to set any definite limit on the party’s time for giving the notice of an issue of foreign law; in some cases the issue may not become apparent until the trial and notice then given may still be reasonable.” In a related vein, appellees contend that KAL failed to satisfy the proof requirements in Rule 44.1, but the explanation in the Advisory Committee notes suggests otherwise. See also Pollack, Proof of Foreign Law, 26 Am.J. Comp.L. 470 (1978). Along with its memoranda of law in support of its JNOY motion, KAL filed a translation and explanatory letter concerning the relevant provisions of the Korean civil code, and added that “KAL preserved its argument that Korean law applied to the issue of punitive damages by including in each Answer filed in this litigation a ‘Notice of Applicability of Foreign Law’ pursuant to Fed.R.Civ.P. 44.1.” The district court never explicitly rejected KAL’s choice of law argument on grounds of being unreasonably late, and I believe it should have been addressed.
The district court entirely failed to engage in the required choice of law analysis. KAL contends that the district court improperly applied D.C. law on the punitive damages question because a proper choice of law analysis would have required reference to Korean civil law. KAL argues that, in multi-district airplane crash litigation, involving plaintiffs from numerous other jurisdictions (both foreign and domestic), the trial court could not just unthinkingly apply forum law to the punitive damages question. Indeed, several other courts have engaged in sometimes agonizing choice of law analyses in similar cases. See In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979, 644 F.2d 594 (7th Cir.), cert. denied, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981) (hereinafter “In re Chicago Crash ”); In re Iowa Crash, 734 F.Supp. 1425; In re Air Florida Crash, 559 F.Supp. 333. See generally Lowenfeld, Mass Torts and the Conflict of Laws: The Airline Disaster, 1989 U.Ill.L. Rev. 157.
For state law claims brought in federal court under diversity jurisdiction, the district court must apply the choice of law principles of the state in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). When a case is transferred pursuant to 28 U.S.C. § 1407(a) by the Panel on Multi-District Litigation, the transferee court must apply the choice of law rules of the states where the transfer- or courts sit. See In re Chicago, 644 F.2d at 610 (citing Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). No such analysis was undertaken in this case. Cf. Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975) (per curiam) (reversing federal court’s decision to ignore forum state’s choice of law rule that would have required application of Cambodian law to wrongful death action). The district court appears to assume that forum law automatically controls and that dépecage is inappropriate, but even application of District of Columbia choice of law principles would dictate otherwise, see Hercules & Co., 566 A.2d at 40-41, and we have no idea what would happen if the district court applied the choice of law principles of each transferor court. The district court erred in failing to undertake a choice of law analysis in this case, a task best left in the first instance to the district court on remand. Even so, it is necessary to explain at some length below why I am unpersuaded by appellees’ arguments.
Appellees suggest that their punitive damage claims were not derived from state law but arose from general federal maritime law. In similar circumstances, the Third Circuit held that
the maritime character of the tort brings the controversy under the governance of federal law and it is immaterial whether admiralty or diversity jurisdiction is relied upon as justification for suing in the federal forum. Obviously, a court thus undertaking to apply federal substantive law would have no occasion to defer to or apply state choice of law rules.
Scott v. Eastern Air Lines, Inc., 399 F.2d 14, 17 (3d Cir.1967) (plane crash in Boston *1493 Harbor), cert. denied, 393 U.S. 979, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968). The district court never explained its refusal to engage in a Klaxon choice of law analysis in these terms, though its treatment of KAL’s motion to strike plaintiffs’ jury demand suggests this reasoning. See In re KAL Disaster, 704 F.Supp. at 1151-57. There the district court held that all of the plaintiffs had properly pleaded (or could amend their complaints to so plead) federal maritime claims and the Warsaw Convention as causes of action, see id. at 1154, 1155-56 (but recognizing that some plaintiffs had only pled state law claims brought pursuant to diversity jurisdiction).
Even if that was the district court’s undisclosed reason for not engaging in a Klaxon analysis for each transferor court, it would not relieve the court of the need to engage in some choice of law analysis under federal law. See Lauritzen v. Larsen, 345 U.S. 571, 575-77, 73 S.Ct. 921, 924-26, 97 L.Ed. 1254 (1953) (finding a conflict between application of Danish and U.S. maritime law). In other words, if application of federal maritime law would authorize punitive damages but Korean law would not, a conflict may exist that needs to be resolved. This is precisely what happened in Harris v. Polskie Linie Lotnicze, 820 F.2d 1000 (9th Cir.1987), a case where the court had to decide as a matter of federal choice of law principles whether Polish law or California law provided the measure of recovery in a wrongful death claim arising from a crash in Poland and governed by the Foreign Sovereign Immunities Act.
In undertaking the federal choice of law analysis, the court in Harris looked to the Restatement (Second) of Conflict of Laws (1969) as “an appropriate starting point.” See id. at 1003-04. The Restatement is, however, a dubious choice of law methodology for a federal court to pick. Choice of law is a very messy field, with different approaches endorsed by competing camps. See In re Paris Air Crash of March 3, 1974, 399 F.Supp. 732, 739 (C.D.Cal.1975) (describing it as “a veritable jungle”). In the past, the lex loci delicti rule was widely used in tort eases, directing courts to use the substantive law of the jurisdiction where the injury occurred, and vestiges of this much criticized approach remain in the Restatement. See Restatement (Second) of Conflict of Laws (hereinafter “Rest.”) §§ 145-146, 175 (presumption of applying the local law where the injury occurred unless another jurisdiction has a more significant relationship to the incident or the parties involved). In Harris, the court decided to apply Polish law of damages, largely because that was the site of the accident and no other jurisdiction had a demonstrably greater interest in the case. See 820 F.2d at 1004 & n. 5. In fact, the lex loci starting point used by the Restatement might be difficult to apply in this case: it is not clear whether KE007 was shot down in Soviet airspace, over Japanese territory or in international waters. Cf. In re Air Florida Crash, 559 F.Supp. at 348 n. 21 (describing earlier case involving a DC-4 mid-air collision where half of the wreckage fell into the Potomac River (deemed part of the District of Columbia) and the other half fell on the Virginia shore); In re Air Crash Disaster Near Bombay, India, 531 F.Supp. 1175, 1182 (W.D.Wash.1982) (parties disputed whether aircraft crashed in international waters or within India’s territorial waters). Indeed, largely because of such uncertainties, the Supreme Court has declined to place much emphasis on the lex loci rule in maritime torts. See Romero v. International Terminal Oper. Co., 358 U.S. 354, 384, 79 S.Ct. 468, 486-87, 3 L.Ed.2d 368 (1959); Lauritzen, 345 U.S. at 583-84, 73 S.Ct. at 928-29.
The Restatement also endorses an amalgam of the “most significant relationship” (or “center of gravity”) test and governmental interest methodologies, see Rest. § 6, reflecting an uneasy compromise struck among the drafters. See von Meh-ren, Recent Trends in Choice-of-Law Methodology, 60 CORNELL L. Rev. 927, 963-64 (1975). The governmental interest approach seeks to identify which jurisdictions may have an actual interest in having their substantive law apply to a particular controversy, but the resolution of true conflicts is achieved through different means *1494 depending on the variant. See generally G. Smith, Choice of Law in the United States, 38 Hastings L.J. 1041, 1043-50 (1987). Whatever the relative merits of the various approaches, the court in Harris went straight to the Restatement as a good source for general choice of law rules to be used as federal common law in the area.
In counting up the contacts, KAL emphasizes that South Korea is its place of incorporation, its principal place of business, and the place where its crews are trained. Ap-pellees respond that many of the passengers came from, the flight originated in, and all of the tickets were purchased in the United States. They cite a decision that suggests using a “center of gravity” approach like the Restatement in maritime cases. See Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). In that case, the Supreme Court applied the Jones Act to a claim by a Greek seaman injured on a Greek ship while it was in American territorial waters, emphasizing that the Greek company that owned the ship had its largest offices in the U.S., was owned by a Greek citizen domiciled in the U.S., and transported cargo to and from the United States. See id. at 307-10, 90 S.Ct. at 1733-35. But Hellenic Lines does not necessarily support appel-lees’ analysis of the relevant contacts in this case because the site of the accident and KAL’s principal place of business were not in the United States. See Romero, 358 U.S. at 383-84, 79 S.Ct. at 486-87 (applying Spanish law to maritime tort claim brought by a Spanish sailor injured on board a Spanish ship while in American waters); Lauritzen, 345 U.S. at 592, 73 S.Ct. at 933 (applying Danish law to maritime tort that occurred in Cuban waters because all parties and the ship were Danish, even though the injured sailor embarked on the ship in New York).
Lauritzen employed something akin to the general, multi-factor approach described in section 6 of the Restatement, though without the initial presumption for applying the lex loci rule:
Maritime law, like our municipal law, has attempted to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved. The criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority.
Id. at 582, 73 S.Ct. at 928 (the relevant contacts included the place of the wrongful act, the law of the flag, the allegiance or domicile of the injured, the allegiance of the shipowner, the place of the contract, the inaccessibility of a foreign forum, and the law of the forum); accord Romero, 358 U.S. at 383, 79 S.Ct. at 486. In fact, Lau-ritzen gave the “law of the flag” the same presumptive weight that the Restatement gives to the place of injury. See 345 U.S. at 585-86, 73 S.Ct. at 929-30 (because the ship was registered in Denmark, Danish law “must prevail unless some heavy counterweight appears”).
At least two federal courts have used the contacts discussed in Lauritzen to resolve choice of law problems in air disasters on the high seas. In Noel v. Airponents, Inc., 169 F.Supp. 348 (D.N.J.1958), a case where a Venezuelan airliner crashed in the Atlantic Ocean, the district court held that federal maritime law would govern to impose liability on the U.S. corporation that had serviced the aircraft before departure. The court emphasized that “[t]he parties to the present litigation are American nationals, and neither the foreign carrier nor the Republic of Venezuela appear to have any interest in the outcome.” Id. at 350-51. In Air Crash Near Bombay, 531 F.Supp. 1175, a case where an Air India Boeing 747 crashed into the Arabian Sea shortly after takeoff, the district court held that Indian law would govern product liability claims against the American manufacturers of allegedly defective aircraft components. The court focused on “the essentially Indian character of this aircraft accident in Indian territorial waters on a flight originating in India involving an Indian air carrier and predominantly Indian victims.” Id. at 1191. This case presents a much sharper *1495 conflict, however, because the contacts appear to be more evenly divided and do not point overwhelmingly to one jurisdiction or the other.
As KAL correctly points out, the question of punitive damages is of primary interest to jurisdictions having some link to the defendant. See In re Chicago Crash, 644 F.2d at 612-13 (decedents’ home jurisdictions only have an interest in recovery of compensatory damages); In re Air Florida Crash, 559 F.Supp. at 352-55. Assuming this is not a Klaxon thicket, the choice is between recovery of punitive damages under general federal maritime law versus non-recovery under Korean civil law. See In re Air Florida Crash, 559 F.Supp. at 347 & n. 19, 351. The balancing of competing interests is no easy task, and even trying to decipher what those interests are is an undertaking fraught with difficulties. Even assuming that Korea made a conscious decision to protect home businesses from excessive judgments, an interest it deemed more important than the added increment of deterrence from punitive damages, such a trade-off for purposes of internal Korean law does not mean that other interested jurisdictions cannot choose to apply punitive damages if they have a countervailing interest in punishment and deterrence that is involved in the controversy. In this case, the United States has an interest in both punishing egregious conduct that begins in this country and deterring its future recurrence. The United States’ interest in deterring willful misconduct on international flights linked to its borders might well outweigh Korea’s more parochial interest in protecting home businesses. Cf. Bernhard v. Harrah’s Club, 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (applying California dram shop law to accidents caused by Nevada taverns even though Nevada had intentionally immunized its taverns from such liability), cert. denied, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976).
I would therefore remand the punitive damages question to the district court with instructions to engage in a proper choice of law analysis.
*1496 [[Image here]]